STANDARD OIL COMPANY, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION, and John F. O'Leary, Administrator, Federal Energy Administration, Defendants.

SUN OIL COMPANY OF PENNSYLVANIA, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Defendants.

MOBIL OIL CO., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Defendants.

TEXACO, INC., Plaintiff,

v.

John F. O'LEARY, Administrator and Federal Energy Administration, Defendants.

GULF OIL CO., Plaintiff,

v.

John F. O'LEARY, Administrator and Federal Energy Administration, Defendants.

SHELL OIL CO., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION et al., Defendants.

AMOCO OIL CO., Plaintiff,

v.

John F. O'LEARY, Administrator, Federal Energy Administration, Defendants.

ATLANTIC RICHFIELD CO., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Federal Energy Administration, Defendants.

EXXON CORPORATION, Plaintiff,

v.

John F. O'LEARY, Administrator of the Federal Energy Administration and Federal Energy Administration, Defendants.

Nos. C76–1279, C76–1288, C76–1344, C77–11, C77–82, C77–92, C77–168, C77–187 and C77–406.

United States District Court,
N. D. Ohio, E. D.

July 21, 1977.

Barbara Allen Babcock, Stanley D. Rose, C. Max Vassanelli, U. S. Dept. of Justice, Washington, D. C., D. D. Weisberger, Asst. U. S. Atty., Cleveland, Ohio, for defendants Federal Energy Administration; John F. O'Leary, Administrator, Federal Energy Administration.

David A. Nelson, Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiff Standard Oil Co.

William H. Allen, James Baller, Robert D. Daniel, Covington & Burling, Washington, D. C.; William T. Smith, Calfee, Halter & Griswold, Cleveland, Ohio; Edward J. Ciechon, Jr., C. S. LeBaron, Sun Oil Co., Philadelphia, Pa., for plaintiff Sun Oil Co. of Pa.

Andrew J. Kilcarr, Washington, D. C., Thomas R. Trowbridge, III, New York City, Arthur F. Zalud, Cleveland, Ohio, Charles S. Lindberg, Mobil Oil Co., New York City, for plaintiff Mobil Oil Co.

Smith Warder, Cleveland, Ohio, William R. Slye, New York City, for plaintiff Texaco.

John M. Cronquist, Cleveland, Ohio, Catherine McCulley, Gulf Oil Corp., Houston, Tex., for plaintiff Gulf Oil Corp.

Louis Paisley, Cleveland, Ohio, for plaintiff Amoco Oil Co.

Sterling Newell, Jr., James A. Dull, Spieth, Bell, McCurdy & Newell Co., L. P. A., Cleveland, Ohio, Richard C. Morse, Los Angeles, Cal., for plaintiff Atlantic Richfield.

Donald B. Craven, A. Theodore Giattina, Miller & Chevalier, Washington, D. C., Michael R. Gallagher, Allan M. Petrov, Gallagher, Sharp, Fulton, Norman & Mollison, Cleveland, Ohio, for plaintiff Exxon Corp.

William Simon, William E. Wickens, Richard A. Kleine, Lesley A. Moradian, Howrey & Simon, Washington, D. C., Wayne C. Dabb, Jr., Baker, Hostetler & Patterson, Cleveland, Ohio, William A. Wood, Shell Oil Co., Houston, Tex., for plaintiff Shell Oil Co.

Alan Novins, Lobel, Novins & Lamot, Washington, D. C., for Consumers Union, amicus curiae.

## MEMORANDUM OF OPINION DENYING THE DEFENDANTS' MOTION TO DISMISS

MANOS, District Judge.

■ Between December 6, 1976 and April 20, 1977, nine petroleum refining corporations[1] filed complaints in this court seeking a preenforcement[2] declaratory judgment invalidating the Federal Energy Administration's (FEA) current interpretation of the petroleum price control regulations that governed the petroleum market during the 13 months between January 1, 1975 and January 31, 1976. On April 22, 1977 the defendants, The Federal Energy Administration and its Administrator,[3] filed a motion to consolidate the nine separate cases and to dismiss the complaint of each refiner corporation.[4] On April 25, 1977 the court conducted a conference in chambers, at which all parties were represented by coun-

1. The nine plaintiffs are: The Standard Oil Company of Ohio, Case No. C76–1279; The Sun Oil Company of Pennsylvania, Case No. C76–1288; The Mobil Oil Corporation of New York, Case No. C76–1344; Texaco Incorporated, C77–11; Gulf Oil Corporation, C77–82; Shell Oil Company, C77–92; Amoco Oil Company, C77–168; The Atlantic Richfield Company, C77–187; The Exxon Corporation, C77–406.

2. This is a "pre-enforcement" declaratory judgment attack on an agency's interpretation of its regulation because the agency has taken no measures, at this time, to initiate an administrative enforcement action against any of the plaintiffs. Compare, National Automatic Laundry and Cleaning Council v. Shultz, 143 U.S. App.D.C. 274, 277, 443 F.2d 689, 702 (1971) (Leventhal, J.).

3. The earliest complaints named Frank Zarb as the Administrator defendant, the Shell complaint named Gorman Smith, and subsequent complaints named John F. O'Leary, the current Administrator. Obviously, the court deems O'Leary to be the Administrator defendant in all cases. See, Fed.R.Civ.P. 25(d).

4. Issues identical to those raised in this case in Ohio, are presented in five cases pending in the Delaware federal district court. Those cases are, Phillips Petroleum Company v. Federal Energy Administration, Case No. 77–90; Tenneco Oil Company v. Federal Energy Administration, et al., Case No. 77–130; Pennzoil Company v. Federal Energy Administration, et al., Case No. 77–131; Coastal States Gas Company v. Federal Energy Administration, et al., Case No. 77–144; Continental Oil Company v. Federal Energy Administration, et al., Case No. 77–155. On June 27, 1977 the Delaware district court denied the FEA's motion to transfer these five cases to this district and also denied the FEA's motion to stay the Delaware cases pending a decision on the FEA's motion to dismiss the Ohio cases. Compare, Abbott Laboratories v. Gardner, 387 U.S. 136, 154–155, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

sel. On April 27, 1977 the court, upon agreement of the parties, ordered: (1) a stay without prejudice, of all proceedings in the nine cases pending this court's decision on the defendants' motion to dismiss; (2) a stay of "all proceedings before the Federal Energy Administration's Office of Exceptions and Appeals concerning the manner in which refiners recovered their non-product costs. . . ."; (3) a briefing schedule for the parties to present arguments to the court in the form of legal memoranda on the FEA's motion to dismiss.[5] On May 26, 1977 the court received the last legal memorandum from the parties. On June 3, 1977 the Consumers Union of the United States moved the court to file an *Amicus Curiae* brief on the motion to dismiss, which motion the court now grants. After considering the arguments of the parties and the *Amicus Curiae,* the court overrules the FEA's motion to dismiss,[6] for the reasons stated in today's Memorandum of Opinion.

**5.** The full text of the April 27, 1977 stay order, to which all the parties agreed, reads:

"This matter came on to be heard this 25th day of April, 1977, in open court, before the Honorable John M. Manos and after full hearing, argument of counsel and on the pleadings and by agreement of the parties, it is ORDERED, ADJUDGED AND DECREED as follows:

"1. Without prejudice, all proceedings pending in this court in the above captioned cases (which are not, by this order, to be deemed consolidated cases) are hereby stayed pending the further order of this court.

"2. Defendants Federal Energy Administration and John F. O'Leary, their employees, agents, attorneys, and all persons acting in concert with them, shall not initiate, process, determine, or in any way act in or upon any and all proceedings arising out of or in any way connected with refiners price rules governing the order of recovery of increased costs during the period of January 1, 1975, through January 31, 1976, or otherwise take action inconsistent with this order, and the 60 day period for filing applications for exceptions set forth in the notice issued by the Federal Energy Administration on April 21, 1977, is tolled until further order of this court.

"3. Plaintiffs shall respond to defendants' 'Motion to Dismiss or in the Alternative for a Stay" on or before May 16, 1977. Defendants may reply to plaintiffs' response within ten days thereafter."

## I.

## STATUTORY AND REGULATORY BACKGROUND

In 1970 the Congress enacted the Economic Stabilization Act, vesting the President of the United States with power to administratively regulate prices throughout the economy. *See,* 12 U.S.C.A. § 1904 note §§ 201–220 (Supp.1977).[7] On August 19, 1973, the Cost of Living Council, acting under delegated authority originating from the Economic Stabilization Act, promulgated regulations imposing complex mandatory price controls on crude oil and petroleum products.[8] On November 27, 1973, the Emergency Petroleum Allocation Act of 1973 (EPAA) became law. *See,* Pub.L. 93–159, 87 Stat. 629. The EPAA incorporated most of the provisions of the 1970 Economic Stabilization Act.[9] Section 4(a) of the EPAA provided for the mandatory alloca-

**6.** The court likewise denies the FEA's alternative motion to stay this case pending administrative exemption proceedings.

**7.** The original Economic Stabilization Act, Pub.L. 91–379, 84 Stat. 799 (August 15, 1970), has been repeatedly amended. *See,* Pub.L. 91–558, Title II, § 201, 84 Stat. 1468 (December 17, 1970); Pub.L. 92–8, § 2, 85 Stat. 13 (March 31, 1971); Pub.L. 92–15, § 3, 85 Stat. 38 (May 18, 1971); Pub.L. 92–210, § 2, 85 Stat. 743 (December 22, 1971) (creating what is now codified as 12 U.S.C. § 1904 note §§ 207–220); Pub.L. 93–28, §§ 2–8, 87 Stat. 27–29 (April 30, 1973).

**8.** 38 Fed.Reg. 22536 (August 22, 1973).

**9.** *See,* Pub.L. 93–159, § 5(a); 1973 U.S.Code Congressional and Administrative News, pp. 699–700; which pertinently provide:

"(1) Except as provided in paragraph (2), (A) sections 205 through 211 of the Economic Stabilization Act of 1970 (as in effect on the date of enactment of this Act) shall apply to the regulation promulgated under section 4(a), to any order under this Act, and to any action taken by the President (or his delegate) under this Act, as if such regulation had been promulgated, such order had been issued, or such action had been taken under the Economic Stabilization Act of 1970; and (B) section 212 (other than 212(b)) and 213 of such Act shall apply to functions under this Act to the same extent such sections apply to functions under the Economic Stabilization Act of 1970.

tion and pricing of petroleum products and Section 4(b)(1) of the EPAA set forth nine objectives which were to be achieved,[10] "to the maximum extent practicable," by the President in whatever allocation and pricing program was devised.

With regard to determining prices, Section 4(b)(2)(A) of the EPAA provided that regulations promulgated by the President:

". . . shall provide for a dollar-for-dollar passthrough of net increases in the cost of crude oil, residual fuel oil, and refined petroleum products to all marketers and distributors at the retail level." See, Pub.L. 93–159, § 4(b)(2)(A); 1973 U.S.Code, Congressional and Administrative News, p. 695.

On December 4, 1973 the President issued Executive Order No. 11748, establishing the Federal Energy Office (FEO) and delegating to the newly created FEO all the authority vested in him by the EPAA, Pub.L. 93–159, 87 Stat. 629, the Economic Stabilization Act as it related to petroleum pricing, 12 U.S.C. §§ 1904 note §§ 201 et seq., and the Defense Production Act of 1950 (DPA), as amended, 50 U.S.C.App. §§ 2061 et seq., as that act related to the President's energy responsibilities. The President also ordered the chairman of the CLC to transfer his pricing authority under the Economic Stabilization Act to the FEO Administrator insofar as that authority related to energy.[11]

On December 13, 1973, the FEO, pursuant to its newly acquired authority, published proposed regulations, which incorporated by reference the earlier CLC's Phase IV petroleum price regulations.[12] These regulations were formally promulgated by the FEO on December 27, 1973,[13] and the incorporated CLC Phase IV petroleum price regulations, were recodified and renumbered on January 14, 1974.[14] Thus the FEO's January, 1974 petroleum price regulations substantially conformed to the petroleum price regulations issued by the CLC in August, 1973.

The reigning petroleum price regulations in August, 1973 (CLC regulations) and January, 1974 (FEO regulations) imposed controls at three levels of the petroleum industry—producers, refiners, and resellers/retailers. The price regulations applicable to refiners such as all plaintiffs in this case, as of January, 1974, may be briefly described in the following fashion.

*BASIC PRICE RULE.* In general, refiners could not exceed their weighted average May 15, 1973 selling prices in transactions with given classes of purchasers, *plus an*

---

"(2) The expiration of authority to issue and enforce orders and regulations under section 218 of such Act shall not affect any authority to amend and enforce the regulation or to issue and enforce any order under this Act, and shall not effect any authority under sections 212 and 213 insofar as such authority is made applicable to functions under this Act."
This provision is currently codified at 15 U.S.C. § 754(a).

**10.** Among the objectives set forth by Congress were:

"(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;
"(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;
"(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;
" . . .
"(H) economic efficiency; and
"(I) minimization of economic distortion, inflexibility, and unnecessary interference with the market mechanisms."
See, Pub.L. 93–159, § 4(b)(1); 1973 U.S.Code Congressional and Administrative News, p. 695; now codified at 15 U.S.C. § 753(b)(1).

**11.** *See,* 38 Fed.Reg. 33575 (December 5, 1973).

**12.** *See,* 38 Fed.Reg. 34414 (December 13, 1973).

**13.** *See,* 39 Fed.Reg. 744 (January 2, 1974).

**14.** *See,* 39 Fed.Reg. 1924 (January 15, 1974).

adjustment designed to permit a dollar-for-dollar passthrough of increased "product" (i. e., raw material) costs incurred between the month of measurement and the month of May, 1973. This price was known as the "base price" for a product.[15] Any increased product costs used in computing base prices had to be applied equally within each class of purchaser, as defined by reference to prices in effect on May 15, 1973.[16]

A refiner was prohibited from increasing its base prices, through the passthrough of increased product costs, more than once per month.[17]

*INCREASED PRODUCT COSTS.* Increased product costs were defined as the difference between the total cost of crude oil and refined products incurred during the month of measurement, and the total costs of crude oil and refined products incurred during the month of May, 1973.[18]

*APPORTIONMENT OF INCREASED PRODUCT COSTS.* Increased product costs could be passed through in refined product prices in the month of measurement. For most refined products (e. g., butane, naphtha, kerosene), a refiner could apportion its total increased product costs among its many product lines in whatever proportion it chose, so long as it did not discriminate among or within the various classes of purchaser of each particular refined product. For certain refined products, however, such as gasoline and No. 2 heating oil, the Phase IV and initial FEO regulations provided special limitations on a refiner's discretion in passing through increased product costs.[19]

**15.** 10 C.F.R. § 212.82(f) (1974); 39 Fed.Reg. 1924, 1953 (January 15, 1974).

**16.** 10 C.F.R. § 212.82(c) (1974); 39 Fed.Reg. 1924, 1953 (January 15, 1974).

**17.** 10 C.F.R. § 212.83(c) (1974); 39 Fed.Reg. 1924, 1955 (January 15, 1974).

**18.** 10 C.F.R. §§ 212.82(f), 212.83(b) (1974); 39 Fed.Reg. 1924, 1953–1954 (January 15, 1974).

**19.** 10 C.F.R. § 212.83(c) (1974); 39 Fed.Reg. 1924, 1955 (January 15, 1974).

**20.** 10 C.F.R. § 212.83(c); 39 Fed.Reg. 1924, 1955 (January 15, 1974).

*BANKED PRODUCT COSTS.* Any amounts of increased product costs which a refiner was unable to recover in a price increase in the month following the month of measurement, because of competitive market conditions or other factors, could be accumulated or "banked" for recovery in a later month.[20]

*NON–PRODUCT COSTS.* In addition to the above passthrough of increased product costs *as part of base prices,* refiners that experienced "non-product" costs (such as increased labor, taxes and other operating and marketing costs) could apply to the CLC (and later to the FEO) for permission to passthrough such increases pursuant to special rules requiring a refiner to "prenotify" and justify to the agency the basis for such increased non-product costs, and then wait a minimum of 30 days before implementing the price increase.[21] No regulatory provision *explicitly* addressed the issue of banking non-product costs or the sequencing of product and non-product cost passthroughs, and product costs were not permitted to be passed through in excess of base prices if it would cause the refiner to exceed a predetermined profit margin limitation.[22]

On May 7, 1974, the Federal Energy Administration Act of 1974 (FEA Act) became law. *See,* 15 U.S.C. §§ 761, *et seq.* On June 25, 1974, pursuant to Executive Order No. 11790, the FEO became the Federal Energy Administration and assumed all responsibilities of the FEO.[23]

**21.** 10 C.F.R. §§ 212.82(c), 212.121–212.130 (1974); 39 Fed.Reg. 1924, 1953, 1960–1961 (January 15, 1974).

**22.** 10 C.F.R. §§ 212.82(i), 212.31 (1974); 39 Fed.Reg. 1924, 1950, 1954 (January 15, 1974). The question of what is the proper interpretation of the applicable regulations, taken in part or in whole, is not before the court on this motion decision, and the court does not now decide that question.

**23.** *See,* 39 Fed.Reg. 23185 (June 27, 1974).

On September 10, 1974, the FEA proposed extensive amendments to the refiner price rules in a Notice of Proposed Rulemaking published in the Federal Register.[24] These regulations did not expressly designate the sequence of recovery of increased product and non-product costs for refiners. However, they did revise the methodology and procedural mechanism for recovering non-product costs by substituting an administratively unsupervised system of increased cost recovery for the system of "prenotification" that had been previously required.[25]

On November 29, 1974, the FEA promulgated final amendments to its petroleum price regulations, effective January 1, 1975.[26] These amendments, *expressly* prohibited refiners from banking their unrecovered non-product costs.[27]

On December 22, 1975 the Energy Policy Conservation Act of 1975 (EPCA), Pub.L. 94–163, became law. Section 402(a) of the EPCA, *see,* 1975 U.S. Code Congressional and Administrative News, 89 Stat. 946,

amended the EPAA, Pub.L. 93–159, § 4(b)(2)(A) to insure that petroleum price regulations:

> "shall provide for a dollar-for-dollar passthrough of net increases in the cost of crude oil, residual fuel oil, and refined petroleum products at all levels of distribution from the producer through the retail level . . . ."[28]

On January 7, 1976, the FEA announced a Notice of Proposed Rulemaking in preparation for designing amendments to the petroleum price regulations in order to reflect the policy adjustments which Congress mandated by enacting the EPCA, Pub.L. 94–163.[29] The January 7 notice did not explicitly discuss the sequence by which a refiner should be permitted to recover costs by increasing prices, *i. e.,* the January 7 notice did not explicitly state that all product costs must be passed through into price increases before any non-product costs could be passed through into a price increase.

---

**24.** *See,* 39 Fed.Reg. 32718 (September 10, 1974).

**25.** *See,* 39 Fed.Reg. 32718, 32721 (September 10, 1974).

**26.** *See,* 39 Fed.Reg. 42368 (December 5, 1974). The regulations, deleted the prenotification procedures, as suggested by the earlier September 10, 1974 proposals.

**27.** *See,* 10 C.F.R. § 212.83(e)(4); 39 Fed.Reg. 42372 (December 5, 1974), which provides:
> "Increased non-product costs calculated pursuant to § 212.87 for the month of measurement which are not recouped in the current month (which is the month immediately succeeding that month of measurement) may not be carried forward for use in computing allowable prices in excess of base prices in any subsequent month. If the allowable prices in excess of base prices charged in a current month result in the recoupment of more than the total amount of increased non-product costs for the month of measurement (the month immediately preceding that current month), the amount of such overrecoupment shall be subtracted from the amount of increased product cost which would otherwise be available in the subsequent month for allocation to base prices of the product or

products with respect to which the overrecoupment of increased non-product costs occurred."

On February 28, 1975 this subsection was renumbered as 10 C.F.R. § 212.83(e)(6), effective April 1, 1975. *See,* 40 Fed.Reg. 10444, 10448 (March 6, 1975). On February 1, 1976 it was renumbered as 10 C.F.R. § 212.83(e)(9). *See,* 41 Fed.Reg. 5111, 5119 (February 4, 1976). The plaintiffs charge that this regulation was promulgated without prior notice or opportunity for comment, all in violation of 15 U.S.C. § 766(i)(1)(B) and Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553(b).

**28.** *Compare,* the Historical Note following 15 U.S.C. § 753 which discusses the 1975 Amendments and pertinently states:
> "Subsec. (b)(2). Pub.L. 94–163, § 402(a), substituted 'regulation under subsection (a) of this section' for 'regulation shall provide for' in the provisions preceding subpar. (A), added 'shall provide for' preceding 'a dollar-for-dollar passthrough' and substituted 'products [at] all levels of distribution from the producer through the retail level;' for 'products to all marketers or distributors at the retail level . . . .' "

**29.** *See,* 41 Fed.Reg. 1680 (January 9, 1976). *See also,* 1975 U.S. Code Congressional and Administrative News, 89 Stat. 693.

On February 1, 1976, after conducting a public hearing,[30] the FEA issued a new regulation, 10 C.F.R. § 212.85, expressly stating that all product costs must be passed through into increased prices before any non-product costs could be passed through. At the same time, the new regulations retained the old rule that non-product costs which were *not* passed through within a specified time after measurement, could *not* be banked for recoupment at a later date.[31] The February 1, 1976 regulations retained the rule that product costs which a refiner chose not to immediately pass through into his base price, thereby increasing his allowable selling price, could be banked, and thus stored for recoupment at an indefinite future date.

The February 1, 1976 rule, expressly mandating the "product cost first" sequence for price increases, applied to all price increases from February 1, 1976 forward, as part of the regulatory amendments generated in response to the enactment of the EPCA, Pub.L. 94–163, in December, 1975. However, in the preamble to the February 1, 1976 promulgation, the FEA stated its interpretation that the regulations governing the period January 1, 1975 through January 31, 1976 embodied an identical "product cost first" sequence rule. The preamble states:

"Many of the comments received by FEA pointed out that *the proposed regulations were silent as to the order in which the various categories of increased costs would be deemed to have been recouped* by refiners in their prices for covered products. A new § 212.85 is therefore being adopted, stating the order in which increased costs will be deemed to have been recouped.

"Under FEA price regulations (*both prior to today's amendment and as amended*), refiners determine their 'increased product costs' . . . , on a calendar month basis, by taking the difference between their May 31, 1973 . . . product cost per barrel and their . .

product cost per barrel for the month for which increased cost are being measured, and then multiplying each per barrel amount by the numbers of barrels . . purchased in that month. . . . The total dollar amount of increased . . . product . . . costs which is thus determined for a calendar month may not be passed through in prices for products which are above a refiner's May 15, 1973 prices until the calendar month following the month in which they were incurred and measured.

"To the extent that the total amount of a refiner's increased costs . . . is not recovered in prices charged during the following calendar month, such increased costs may be carried forward or 'banked' and passed through in prices charged in subsequent months. . . . Non-product costs may not be 'banked' and are therefore considered to be recouped only after all available 'increased product costs' . . . have been applied to establish 'base prices.'

" . . .

"FEA . . . has, in the amendments adopted today, distinguished among the various categories of unrecovered increased costs, and specified the required order of recoupment.

"Except for the complexities introduced by [the EPCA] . . . , *the order specified in the new § 212.85 is the same as that under the regulations previously in effect.*

" . . .

" . . . Increased non-product costs . . . must be recouped last."

41 Fed.Reg. 5111, 5113 (February 4, 1976) (emphasis added).

After the February 1, 1976 preamble and announcement, many refiners, including some of the plaintiffs in this case, notified the FEA that they had interpreted the regulations that governed the period January 1, 1975 through January 31, 1976 to permit

---

**30.** The public hearing was conducted on January 26, 1976. *See,* discussion in 41 Fed.Reg. 5111 (February 4, 1976).

**31.** *See,* fn. 27, *supra,* and accompanying text.

the passthrough of non-product costs before the passthrough of product cost,[32] i. e., exactly the reverse sequence which the FEA first *explicitly* stated on February 1, 1976 was the correct interpretation of the regulations controlling petroleum prices between January 1, 1975 and January 31, 1976. The court designates this group of refiners as the "Reverse Sequential" group.

After the February 1, 1976 announcement a different group of refiners, of which some of the plaintiffs in this case are members, notified the FEA that they had followed a third interpretation of the regulations governing prices between January 1, 1975 and January 31, 1976. This group interpreted those regulations to mandate a "proportional" approach to the recovery of non-product costs. Under the approach used by most of the "proportional" recovery companies, increased product costs and non-product costs were deemed recovered in selling prices in the same proportion in which they were utilized in calculating maximum allowable prices for specific items marketed. In months in which prices charged for a particular petroleum product were below their maximum allowable levels, application of the proportional approach meant that some non-product costs would be recovered before all available product cost increases had been exhausted, though it also meant that the opportunity to recover some increased non-product costs would be lost forever.[33]

Both the Reverse Sequential group and the Proportional group proclaimed to have never understood that the FEA regulations controlling the period January 1, 1975

through January 31, 1976 mandated the "product-cost first" approach, since those regulations did not explicitly state such a requirement.[34]

Thus the ultimate issue on the merits of the plaintiffs' pre-enforcement declaratory judgment action currently pending before this court first surfaced as a dispute between the plaintiff refiners and the FEA on February 1, 1976. That issue is:

Whether the FEA's petroleum price regulations, governing petroleum prices during the period January 1, 1975 through January 31, 1976, validly stated that all available product costs had to be passed through as base price increases before any non-product cost increments could permissibly be passed through to increase the market price of a petroleum item?

However, the issue of the accurate interpretation of the petroleum price regulations governing the period January 1, 1975 through January 31, 1976 is not the issue now before this court on the defendants' motion to dismiss. The defendants argue that the plaintiffs' pre-enforcement declaratory judgment action should be dismissed because the substantive issue of which interpretation of the regulations in effect during the designated time frame is correct is: (1) an issue not yet ripe for judicial determination; (2) an issue on which available administrative remedies have not yet been exhausted; (3) an issue on which this court should defer to administrative proceedings under the doctrine of "primary jurisdiction."

---

**32.** The refiners who passed through non-product costs first were thus able to bank a larger portion of their monthly product costs, and avoid the "use or loss" effect that the no banking of non-product costs rule triggered with respect to each month's increased non-product costs. The plaintiff refiners insist that their method of cost increase recoupment is consistent with the prohibition on banking monthly non-product costs.

**33.** *See,* discussion in 41 Fed.Reg. 33282, 33283 (August 9, 1976), quoted in the text of this Memorandum of Opinion accompanying fn. 43, *infra.*

**34.** Ultimately the FEA may have admitted the validity of the proportional interpretation when it announced, "Although FEA acknowledged in its August 3, 1976 notice that refiners might have concluded in good faith that other interpretations of the regulations than the sequential interpretation adopted by FEA *were correct. . . .* " *See,* 41 Fed.Reg. 43953, 43954 (October 5, 1976) (emphasis added). However, the court has not now considered whether the FEA accurately interpreted the regulations governing the period in question.

## II.

### FACTS PERTAINING TO THE DEFENDANTS' MOTION TO DISMISS

The promulgation of § 212.85, explicitly imposing a "product-cost first" rule for the period February 1, 1976 forward, accompanied by the FEA's comments in the preamble that the agency interpreted the regulations controlling the period January 1, 1975 through January 31, 1976 to implicitly embody the same product-cost first rule, triggered an immediate outcry from both the *Reverse Sequential* refiners and the *Proportional* refiners. On March 3, 1976 the FEA issued a Notice of Proposed Rulemaking, furnishing reasons for the "product-cost first" rule discussed in the February 1, 1976 announcement and stating that the FEA would now consider whether § 212.85 should be modified, whether such modifications should be retroactive to February 1, 1976, and whether "clarifying amendments" should be adopted with respect to the period January 1, 1975 through January 31, 1976.[35] The FEA's March 3, 1976 Notice of Proposed Rulemaking stated the agency's reasons for its "product-cost first" rule:

"On February 1, 1976 the Federal Energy Administration ('FEA') issued amendments to its regulations (41 FR 5111, February 4, 1976) implementing the pricing policies of sections 401 and 402 of the Energy Policy and Conservation Act ('EPCA,' Pub.L. 94–163). The FEA stated in the preamble to the amendments that it was considering issuing a notice of proposed rulemaking and public hearing to 'address a number of the issues regarding non-product costs raised in comments during this rulemaking.' Two such issues raised in the comments were the order of recoupment of increased non-product costs and the prohibition against the carry-forward or 'banking' of increased non-product costs. This notice of proposed rulemaking and public hearing will address these issues further.

"To the extent that the total dollar amount of a refiner's 'increased product costs' . . . incurred in the 'month of measurement' is not recouped in prices charged during the following, or 'current' month, such increased product costs may be carried forward or 'banked,' and, subject to certain limitations, are available for recovery in prices charged in subsequent months. However, pursuant to § 212.83(e)(9) (numbered § 212.83(3)(6) prior to the February 1, 1976 amendments), increased non-product costs (e. g., increased costs of marketing, refinery fuel, labor, additives, etc.) which are not recouped in the month following the month in which they were incurred may not be 'banked' or carried forward 'for use in computing allowable prices in excess of base prices in any subsequent month.'

"In the February 1, 1976 amendments, a new § 212.85 was adopted stated [stating] the order in which increased costs are deemed to be recouped, including both product and non-product costs, and including the new categories of costs that were established to implement the pricing policy provisions of the EPCA. Section 212.85 requires refiners to recover: first, total available increased product costs . . . and second, increased non-product costs only after all available increased products have been recouped. The FEA stated in the preamble to the amendments adding § 212.85:

'To the extent that the total amount of a refiner's increased costs of crude oil incurred in one calendar month . . . is not recovered in prices charged during the following calendar month . . . such increased costs may be carried forward or "banked" and passed through in prices charged in subsequent months, subject to certain limitations. Non-product costs may not be "banked" and are therefore considered to be recouped only after all available "increased product costs" (increased costs of crude oil

---

**35.** *See,* 41 Fed.Reg. 9196, 9200 (March 3, 1976).

and of purchased products) have been applied to establish "base prices."

\* \* \* \* \* \*

'Except for the complexities introduced by the statutory two-month and ten percent limitations, the order specified in the new § 212.85 is the same as that under the regulations previously in effect.'

"The purpose of requiring refiners to recoup all available increased product costs prior to recouping any increased non-product costs is to prevent refiners from carrying forward or banking increased non-product costs. Pursuant to § 212.83(e)(9) refiners may not carry forward or 'bank' increased non-product costs which are not recouped in the month following the month in which they are incurred. Accordingly, a refiner which recoups increased non-product costs before recouping all of its available increased product costs and 'banks' its unrecouped available increased product costs is, in effect, 'banking' an amount of increased product costs equal to the amount it 'banks.' Thus the practical effect of permitting refiners to pass through increased non-product costs before recouping all available increased product costs would be to permit non-product costs to be 'banked' or carried forward in violation of § 212.83(e)(9).

"Resellers, reseller-retailers, and retailers are not permitted to carry forward unrecouped increased non-product costs. Ruling 1975–16 (40 FR 40834, September 4, 1975) states:

'Pursuant to § 212.93(e), Firm X is permitted to carry forward unrecovered "increased costs," as defined in § 212.92 (i. e., unrecovered increased product costs), for recovery in a subsequent month. The regulations do not include a corresponding provision for the carry forward of amounts by which prices charged do not take full advantage of the authorization in § 212.93(b) to charge prices in excess of those otherwise permitted to reflect increased non-product costs.

\* \* \* \* \* \*

'\* \* \* prices are regarded as being constituted of three elements, in the sequence in which those elements are set forth in the regulations; i. e., first, May 15, 1973 price; second, the increased product costs; and, third, increased non-product costs.'

"Thus, Ruling 1975–16 not only holds that resellers, reseller-retailers, and retailers may not 'bank' unrecouped increased non-product costs but specifically states the sequence of recovery of increased costs which is necessary in order to prevent the 'banking' of increased non-product costs.

"On February 17, 18, and 19, 1976, as required by section 11(a) of the Emergency Petroleum Allocation Act of 1973, as amended, (EPAA), FEA held public hearings and received written comments with respect to the adequacy and continuing necessity of FEA's mandatory price and allocation regulations to achieve the goals of the EPAA. A number of refiners commented that the sequence of recoupment of increased costs as set forth in § 212.85 was contrary to FEA's stated policy of granting refiners greater pricing flexibility. These refiners argued that in order to grant greater pricing flexibility and thus avoid distortions of refinery operations, the sequence of recoupment of increased product and non-product costs should be at the refiners option, subject to the limitations imposed by the EPCA.

"FEA has become aware that several different methods of calculation are being applied by refiners in computing the amount of non-product costs that are applied in prices charged during a month and the amount of these costs that are recovered in sales during a month. In some instances, non-product costs have been applied or recovered first. It appears other refiners are prorating total cost recoveries between product and non-product cost increases. Both methods of calculation, in effect, cause the 'bank' of product costs to subsidize the current re-

covery of non-product costs. This suggests that refiners are construing the 'base price' (May 15, 1973 prices plus increased product costs) and a 'price in excess of the base price' (i. e., base price plus non-product costs) differently than FEA had previously formally construed these terms. (See: "Gulf Oil Corp.,' Case No. FEA–0301, FEA ¶ 80,552, March 21, 1975.)"

See, 41 Fed.Reg. 9196, 9199–9200 (March 3, 1976).

The March 3, 1976 announcement also states the FEA's purpose for conducting a public hearing and rulemaking proceeding with respect to the February 1, 1976 "product-cost first" statement:

"The purpose of this notice of rulemaking and public hearing is to gain information concerning the combined effects of § 212.83(d) and (e)(9) and the new § 212.-85, as adopted February 1, 1976 to comply with the EPCA two-month and ten percent limitations, on the ability of refiners to pass through increased product and non-product costs. In particular, FEA wishes to determine whether the regulations in their present form operate so as to have a serious adverse impact on refining operations.

"Accordingly, FEA invites interested parties to comment on the following:

"1. Should the specified order of recovery of increased product and increased non-product costs be modified to permit a proportionate share of each type of costs to be recovered each month? To illustrate, if a firm recouped 80 percent of its available increased product costs in sales during a month (and 'banked' 20 percent), under this alternative treatment it would be permitted to recoup up to 80 percent of its increased non-product costs (but not to 'bank' the remaining 20 percent). What other method of computing such recovery could be devised?

"As FEA noted in the amendments of February 1, 1976, the designation of the order of cost recovery was provided at the specific requests of participants in that proceeding, and was intended to assure that those costs of crude oil first incurred could be considered to be first recouped, in order to minimize the adverse effects of the two-month and 10 percent limitations imposed by the EPCA.

"2. Should some or all of any increased non-product costs not recouped during the month following the month in which they were incurred be permitted to be carried forward, or 'banked,' for recovery in subsequent months? (See § 212.-83(e)(9).)

"3. To what extent would the proposals contemplated in this proceeding change or affect the type of calculations presently being applied by refiners. In addition, FEA requests that refiners identify other applicable regulations (e. g., definition of 'base price,' § 212.82(b); allocation of increased non-product cost, § 212.83(d); etc.) which would require change or modification to effect the proposals advanced herein.

"FEA also requests comments from refiners as to what order of recovery of increased product and non-product costs they employed prior to February 1, 1976 and the reasons for selecting the particular order of recovery used.

"FEA is proceeding with this aspect of its review of the price regulations regarding non-product costs on an expedited basis in view of comments which have been received since issuance of the February 1 amendments stating that those amendments seriously threaten to disrupt refinery operations, to impair maintenance of normal inventory levels and to result in wide month-to-month price fluctuations. In light of these potentially disruptive effects, FEA will consider in this proceeding whether the amendments, if any, which are adopted herein should be made retroactive to February 1, 1976 in order to coincide with the effective date of § 212.85, and whether clarifying amendments should be made with respect to the order in which increased non-product costs were to have been recovered under regulations in effect prior to February 1, 1976."

See, 41 Fed.Reg. 9196, 9200 (March 3, 1976) (emphasis added).

On March 18, 1976, a public hearing was held at which numerous respondents, including the plaintiffs in this case, testified. Both the Reverse Sequential group and the Proportional group protested the inauguration of a strict all available "product cost first" rule, arguing that such a rule violated the EPAA, Pub.L. 93–159,[36] as amended by the EPCA, Pub.L. 94–163,[37] for the period February 1, 1976 forward. In addition, the protestors urged that such a rule would damage the refining industry as well as the public at large. Both groups emphatically challenged the FEA's interpretation that the regulations governing January 1, 1975 through January 31, 1976 mandated the "product-cost first" concept.[38]

On April 6, 1976, the FEA rescinded § 212.85, the explicit "product-cost first" rule effective as of the date of its original issuance, February 1, 1976.[39] In doing so the FEA catalogued a wide array of adverse consequences that could be expected to flow from the "product-cost first" rule in combination with other restrictions in the regulations. Specifically, the FEA stated that the rule "would tend to have undesirable inflationary effects on current market prices," that "prices would also tend to wide monthly fluctuations," that the rule could operate as "a disincentive for refiners to build up inventories," that it would provide refiners an incentive to "decrease refinery production," and that, because of the restrictions, "capital investment to expand refiner capacity might be reconsidered and deferred or eliminated."[40]

In addition to rescinding the explicit "product-cost first" rule for the period February 1, 1976 forward, the April 6, 1976 regulatory amendments eliminated the "base price" concept, and permitted, for the time frame February 1, 1976 forward, the passthrough of unrecouped non-product costs into price increases, according to a *proportional* formula, similar to the approach which the "Proportional" refiners adopted in construing the regulations which governed the period January 1, 1975 through January 31, 1976.[41] Although the FEA's April 6, 1976 announcement changed the price regulations controlling the period February 1, 1976 forward, the agency was mute regarding its earlier interpretation that the regulations which governed January 1, 1975 through January 31, 1976 mandated a "product-cost first" passthrough price rule for the earlier time frame. The only comment uttered by the FEA regarding the January 1, 1975 through January 31, 1976 period in its April 6, 1976 announcement was:

**36.** *See,* 1973 U.S. Code Congressional Administrative News, pp. 693, 695.

**37.** *See,* 1975 U.S. Code Congressional Administrative News, 89 Stat. 871, 946.

**38.** The exhibits submitted by the plaintiffs to the court for consideration on the motion to dismiss contain the arguments which several refiners expressed in rebuttal to the FEA's interpretation of the regulations controlling the period January 1, 1975 through January 31, 1976, at the March 18, 1976 public hearing. *See,* Plaintiffs' Exhibits B–3, pp. 1–7; B–2, pp. 2–11; B–3, pp. 1–7. Those exhibits also indicate the views of many of the refiners that the "product-cost first" rule severely injures both the public and the refining industry by eliminating profits, creating incentives for premature passthroughs of increased costs, creating incentives to maintain low inventories thereby causing fuel shortages, and aggravating the industry's cost accounting difficulties. *See,* Plaintiffs' Exhibits B–1(A); B–1, p. 5; B–3, p. 1–A, 2–A.

**39.** *See,* 41 Fed.Reg. 15330 (April 12, 1976).

**40.** *See,* 41 Fed.Reg. 15330, 15331 (April 12, 1976); *Compare* and *contrast* with the statutory objectives set forth in fn. 10, *supra.*

**41.** *See,* 10 C.F.R. § 212.83(f)(4) (1976), 41 Fed. Reg. 15330, 15339 April 12, 1976) which pertinently states:

"Increased costs of purchased products *and increased non-product costs* incurred on or after January 1, 1976 and three or more months before the current month ('u') and not recovered through the month of measurement ('t'), represented by the symbols 'B' and 'N' under the general formulae in § 212.83(c) and considered to be recouped in that respective order, provided that the portion of such amount deemed to have been recovered in the current month ('u') shall not exceed the limitation imposed by paragraph (e)(7) of this section." (emphasis added).

"FEA is also still considering appropriate action, including further regulation amendments pursuant to this rulemaking proceeding, regarding the rules on recoupment of increased non-product costs prior to February 1, 1976."

See, 41 Fed.Reg. 15330, 15333 (April 12, 1976).

On August 3, 1976, the FEA announced that it was currently considering a "Proposed Class Exception" for at least some of the refiners who, between January 1, 1975 and January 31, 1976, passed non-product costs into price increases in a fashion different than the "product-cost first" rule which the FEA continued to maintain was the correct interpretation of the regulations that governed that period.[42] The FEA acknowledge that some refiners might in "good faith" have "misinterpreted" the regulations to permit recoupment of non-product costs on a proportional basis; that the FEA audit manual also "partially reflected this view;" that the regulations contained "possibly ambiguous language;" that refiners might have been misled by "certain information diseeminated by FEA;" and that enforcing an all "product-cost first" approach might result in "potentially *massive refunds* or *'bank' reductions,*" which could have a drastic effect on the cash resources of refiners who in good faith set prices on the proportional interpretation of the regulations. (emphasis added). See, 41 Fed.Reg. 33282, 33283 (August 9, 1976). The FEA's notice declared:

"During 1975 and January 1976, the passthrough of increased non-product costs was subject to a profit margin limitation (i. e., a refiner could pass through increased non-product costs only if its profit margin in the current fiscal year did not exceed its base period profit margin). The regulations referred to the passthrough of increased non-product costs as a price increase above base prices. Section 212.83(e)(9) prohibited 'banking' of unrecovered increased non-product costs; § 212.87(b) provided for allocation of such costs to each product or

product category of the type 'i' on a volumetrically proportional basis; and § 212.83(d) required increased non-product costs to be recovered among individual covered products in the same proportions as increased product costs were recovered. The purpose of § 212.83(d) was to provide a basis for allocating increased non-product costs among individual covered products within the category of general refinery products, in much the same manner that § 212.87(b) provided for allocation of increased non-product costs among products or product categories of the type 'i,'

"However, it appears that § 212.83(d) was understood by many refiners to authorize a proportional computation of the portions of each type of increased costs— product and non-product—deemed to have been recovered in prices charged by refiners, whether or not all available increased product costs had first been recovered. The FEA audit manual, which was apparently available to some but not all refiners, also partially reflected this view.

"Statements included in various notices of proposed rulemaking, however, have generally reflected the former rather than latter interpretation of the regulatory language referred to above, which required increased product costs to be recovered before increased non-product costs.

". . .

"To enforce the regulations as requiring recovery of all increased product costs prior to the recovery of any increased non-product costs during the period January 1, 1975 through January 31, 1976— *thus resulting in potentially massive refunds or 'bank' reductions—could have a drastic effect on cash resources of refiners who in good faith set prices based on the 'proportional' interpretation of the regulations.*

"If firms were to be required to apply individually for exceptions relief, FEO believes that a significant number of re-

---

42. See, 41 Fed.Reg. 33282, 33283 (August 9, 1976).

finers would apply and be eligible for such relief on the basis of serious hardship or gross inequity.

"Although FEO believes that its interpretation of the meaning of the language used in the regulations is correct—i. e., increased product costs were required to be recovered first; banking of unrecovered increased non-product costs was not permitted—it nevertheless acknowledges that refiners might have concluded in good faith that recoupment on a proportional basis was permitted as a result of possibly ambiguous language in § 212.-83(d) and certain information disseminated by FEA."

See, 41 Fed.Reg. 33282, 33283 (August 9, 1976) (emphasis added).[43]

At the same time that the FEA recognized that the regulations covering the period January 1, 1975 through January 31, 1976 partially supported the interpretation of the Proportional refiners, the FEA restated its position that the petroleum price regulations governing that period furnished no support for the Reverse Sequential refiners. The FEA announced,

"It is FEO's understanding that some refiners interpreted the regulations in yet another manner, to permit the addition to May 15, 1973 prices of, first, available increased non-product costs and, second, the amount of available increased product costs required to reach desired selling prices, thus permitting the refiner to carry forward or 'bank' all unrecovered increased costs—since under this approach all such unrecovered costs would have been deemed unrecovered increased product costs, which could be carried forward. *The regulations were not intended to authorize this approach nor can FEO find in the regulations any arguable basis for use of this approach.*"

See, 41 Fed.Reg. 33282, 33283 (August 9, 1976) (emphasis added).

Based on the FEA's fixed interpretation of the regulations governing the period January 1, 1975 through January 31, 1976, and the above delineated policy considerations, the FEA announced that it would consider the possibility of initiating class exception proceedings to "authorize the 'proportional' cost recovery approach retroactively for *all* refiners," and to furnish those firms "which properly applied the cost recovery rules" with an opportunity to retroactively adjust their "banks" upward according to the proportional passthrough concept. *See,* 41 Fed.Reg. 33282–33283

---

**43.** The FEA furnished an example of the operational difference between the two approaches in its August announcement.

"The difference between the approach authorized in the regulations and the 'proportionality' approach may be illustrated as follows:

"$2,200,000 increased costs were recovered on sales of a product in a month.

"$300,000 non-product cost increases were available.

"$3,000,000 product cost increases were available.

"$3,300,000 total increased costs were available.

" *'Proportional' recovery:*

"$2,200,000/$3,300,000 = ⅔ of available increased costs were recovered;

"⅔ × $300,000 – $200,000 of non-product cost increases were recovered;

"⅔ × $3,000,000 – $2,000,000 of product cost increases were recovered.

"$1,000,000 of product cost increases may be carried forward.

"The unrecovered $100,000 of non-product cost increases may not be carried forward.

" *'Sequential' recovery:*

"$2,200,000 of product costs increases were recovered; no non-product cost increases were recovered;

"$800,000 of product cost increases may be carried forward;

"The unrecovered $300,000 of non-product cost increases may not be carried forward."

*See,* 41 Fed.Reg. 33282, 33283 (August 9, 1976) (emphasis added). The adverse effect of the FEA's interpretation on those refiners that employed the Reverse Sequential (*i. e.,* all non-product costs first) approach may be substantially greater than the effect on the Proportional group. Although the record does not show precisely how much in costs each group passed through in increased prices, both groups may well be severely jeopardized by the FEA's regulatory interpretation, since the aggregate amounts involved numbers in the many millions. *See,* Affidavits of Dale O. Maxwell, Dale E. Choate, and T. W. Gillette, submitted as Plaintiffs' Exhibit C, D, E.

(August 9, 1976) (emphasis added). The FEA solicited data from all refiners in order to quantify the magnitude of the problem, and thereby facilitate consideration of the proposed class exception.

On September 15, 1976, the FEA released the results of the survey it initiated in connection with the proposed class exception announced on August 3, 1976. *See,* 41 Fed.Reg. 40559 (September 20, 1976). The FEA's description of the "Background" of the survey reiterates the agency's interpretation of the regulations that governed the period between January 1, 1975 and January 31, 1976, and also noted factors that might have caused some refiners to interpret those regulations differently.[44]

The survey data released demonstrated that all refiners subject to the applicable regulations sustained an aggregate total of 4.3 billion dollars worth of increased non-product costs during the period January 31, 1976, and that: (1) all refiners subject to the regulations in question *actually* passed through, in price increases, 3.7 billion dollars of increased non-product costs; (2) if all refiners had employed the proportional interpretation of the applicable regulations, then the total amount of increased non-product cost passed through as price increases would have been 3.6 billion dollars; (3) if all refiners had employed the product-cost first rule espoused by the FEA, then the total amount of increased non-product cost passed through into market price increments would have been 2.4 billion dollars.[45] The survey data published by the FEA on September 20, 1976 revealed that the differences between the amount of "non-product cost" price increases allowed under the FEA's interpretation of the applicable regulations and the amount of "non-product cost" increases allowable under a "proportionate" passthrough interpretation, or on the other hand, the amount *actually* passed through, equaled approximately 1.3 billion

dollars.[46] Thus, according to the FEA's understanding of the applicable regulations, during the applicable period, the refiners overcharged the American public in an amount equaling 1.3 billion dollars. In the eyes of the FEA, strict enforcement of its regulations would result in orders against refiners, such as the plaintiffs in this case, to either issue refunds to purchasers or decrease the refiners' banks in an industry-wide aggregate of 1.3 billion dollars.

The results of the FEA's survey, also revealed: (1) that 104 firms responded to its request for information regarding non-product cost passthroughs during the time frame January 1, 1975 through January 31, 1976; (2) that 46 firms either applied the FEA's interpretation of the applicable regulations or passed through no non-product costs: (3) that 29 refiners fell into the category of "Proportional" firms, *i. e.,* firms which passed through a proportion of non-product costs ahead of product costs in formulating their monthly selling prices; (4) that 29 refiners fell into the Reverse Sequential category, *i. e.,* they passed through non-product costs ahead of all product costs in formulating their selling prices.[47]

After presenting this data the FEA's announcement stated:

"FEA also requests specific comments on whether the sequential [product-cost first] interpretation rule is inequitable in application because the data indicates that it operates to prevent refiners from recovering 1.9 billion dollars of the 4.3 billion dollars of FEA allowable increased non-product costs."

*See,* 41 Fed.Reg. 40559, 40560 (September 20, 1976).

Three days after the results of the FEA's survey were released to the public, Frank G. Zarb, the Administrator of the FEA wrote a letter to Congressman John D. Dingell, Chairman of the House of Representa-

---

44. *See,* 41 Fed.Reg. 40559 (September 20, 1976).

45. *See,* 41 Fed.Reg. 40559, 40560 (September 20, 1976).

46. These figures were rounded off and therefore they do not correspond symetrically. *See,* 41 Fed.Reg. 40559, 40560 (September 20, 1976).

47. *See,* 41 Fed.Reg. 40559, 40560 (September 20, 1976).

tives' Subcommittee on Energy and Power, stating:

"Recent press reports about FEA's proposed class exception on the passthrough of increased non-product costs by refiners before February 1, 1976 have caused me grave concern that basic FEA policies and procedures involved in the resolution of this proceeding may be misunderstood. I have, therefore, decided to issue a notice in the *Federal Register* explaining these policies and procedures in greater detail. Knowing of your interest in this matter, I would like to call these policies and procedures to your attention.

"First, FEA has never permitted, and shall never permit any firm to be excused from compliance with our regulations merely on the basis that a misinterpretation of the regulations was made in good faith. Moreover, under FEA's regulations regarding exception relief, no firm may be relieved of its legal requirement to comply with FEA's regulations solely on the grounds of good faith reliance on erroneous guidance from FEA personnel. Both of these principles have been fully enunciated in published FEA exception decisions. The only basis upon which a firm could obtain relief under the regulations would be pursuant to a finding, in an adjudicatory proceeding before FEA's Office of Exceptions and Appeals, that enforcement of the regulations under all relevant circumstances would, in fact, cause a serious hardship or gross inequity to that firm.

"Second, as you know, in our August 3, 1976 notice of this proposed class exception, *FEA reaffirmed that the interpretation which was issued on February 1, 1976 of the November 29, 1974 regulations is correct, i. e., increased product costs were required to be recovered first and banking of unrecovered increased non-product costs was not permitted. We fully intend to enforce this interpretation of the regulations in all instances other than those in which a firm has applied for and been granted relief by FEA's Office of Exceptions and Appeals.*

"Third, although the nature of the proceeding for which a notice was issued on August 3, 1976 was termed a 'class exception,' it should more accurately be considered as an invitation to all refiners to apply for exception relief in a consolidated exceptions proceeding because FEA perceived that many firms had misapplied the regulations in a similar manner. Of the total number of approximately 135 domestic refiners, 104 responded to the August 3 notice by submitting data. Accordingly, this proceeding, in fact, now involves 104 separate cases, all of which relate to the same subject matter.

"The need to handle this 'class exception' on a firm by firm basis has become apparent after receipt of the data submitted by each of the 104 refiners, since not all refiners misapplied the regulations for the same reasons or to the same extent. To determine the precise impact of requiring full compliance with the correct interpretation of the order of recovery for each of the 104 refiners involved has necessitated an audit of each refiner, a process which is now underway. We still intend to hold a consolidated hearing on October 13 on the common issues involved in this proceeding in order to permit maximum public participation in our decision making process. However, no decision will be rendered with respect to any particular refiner until the audit of that firm is completed and a determination is made whether strict compliance with FEA regulations by that particular firm would, in light of all the circumstances and impacts, result in a serious hardship or gross inequity to that firm. In determining whether to grant exception relief in a specific case, you may be assured that FEA will consider the interests of consumers and all others who may be affected by any exception relief granted. A balancing of interests and equities will be made in each case to assure that the interests of all affected parties are protected.

"Finally, I wish to assure you that FEA has in no way prejudged the propriety of the activities of any firm which has ap-

plied for relief in this proceeding. As is always the case in compliance and exception cases, we have a completely open mind. Before any final decisions are made, we still must gather more detailed information with respect to each of the refiners seeking relief and consider as well both written comments and oral presentations at the public hearing. The ultimate form of relief, if any, that may be granted could, of course, conceivably take as many different forms as there are firms participating in this proceeding." (emphasis added).[48]

On October 5, 1976, the FEA published a notice stating the procedures and criteria designed to govern the exception proceedings.[49] The "Introduction" to the October 5, 1976 document reaffirmed the validity of the FEA's interpretation of the petroleum price regulations governing the period January 1, 1975 through January 31, 1976, and stated the agency's firm intention to enforce that interpretation.

"In the August 3, 1976 notice of this proposed class exception, FEA reaffirmed that the interpretation which was issued on February 1, 1976 of the November 29, 1974 regulations is correct, i. e., increased product costs were required to be recovered first and banking of unrecovered increased non-product costs was not permitted. FEA wishes to emphasize that it fully intends to enforce this interpretation of the regulations in all instances other than those in which a firm has applied for and been granted relief by FEA's Office of Exceptions and Appeals." [50]

The October 5, 1976 announcement repeated the FEA's earlier stated recognition that some refiners, acting in good faith, could have interpreted the regulations in

question differently from the interpretation adhered to by the agency.

"In the August 3, 1976 notice of this proceeding, FEA acknowledged that 'refiners might have concluded in good faith that recoupment on a proportional basis was permitted as a result of possibly ambiguous language in § 212.83(d) and certain information disseminated by FEA.'

". . .

"Although FEA acknowledged in its August 3, 1976 notice that refiners might have concluded in good faith that other interpretations of the regulations than the sequential interpretation adopted by FEA *were correct*, FEA has never permitted any firm to be excused from compliance with its regulations merely on the basis that a misinterpretation of the regulations was made in good faith. . . Moreover, under FEA's regulations regarding exception relief, no firm may be relieved of its legal requirement to comply with FEA's regulations solely on the grounds of good faith reliance on erroneous guidance from FEA personnel."

*See,* 41 Fed.Reg. 43953–43954 (October 5, 1976) (emphasis added).

The criteria for exception relief set out in the October 5, 1976 notice required each individual refiner to demonstrate entitlement to an exception by proof that it would suffer "serious hardship or gross inequity" [51] from enforcement of the FEA's interpretation of the applicable regulations. The agency particularly stressed that the key to success in the exception proceeding was proof of unique facts demonstrating that strict enforcement of FEA's predetermined, correct interpretation of the regulations governing the January 1, 1975 through January 31, 1976 time frame, would work a "serious hardship or gross inequity" on a particular refiner.

---

**48.** *See,* Letter attached to Plaintiffs' Discovery Requests filed in this court on December 21, 1976 in the *Standard Oil Company v. Frank G. Zarb, Administrator, Federal Energy Administration, et al.,* Case No. C76–1279.

**49.** *See,* 41 Fed.Reg. 43953 (October 5, 1976). This document also cites the FEA's Exception Regulations. 10 C.F.R. §§ 205.50 through Appendix (1977). The Exception Appeal Regula-

tions may be located at 10 C.F.R. §§ 205.00–205.109 (1977).

**50.** *See,* 41 Fed.Reg. 43953 (October 9, 1976).

**51.** *See,* 41 Fed.Reg. 43953–43954 (October 5, 1976) and the FEA's Exception Regulations, 10 C.F.R. §§ 205.50(a)(1), 205.55(b)(2).

"The nature of this proceeding, therefore, although termed a 'class exception,' is more accurately described as an invitation to all refiners to apply for individual exception relief within the scope of a consolidated exceptions proceeding. Such a proceeding is appropriate in this instance because FEA perceived that many firms had misapplied the regulations in a similar manner. However, although the FEA might consider a number of individual exception applications on a consolidated basis if they raise common questions of fact or law, it is still envisioned that any firm requesting exception relief must establish on an individual basis that it is subject to a serious hardship or gross inequity as a result of the FEA regulatory requirements.

". . .

"The only basis upon which a firm may obtain relief under the regulations is pursuant to a finding, in an adjudicatory proceeding before FEA's Office of Exceptions and Appeals, that enforcement of the regulations under all relevant circumstances would, in fact, cause a serious hardship or gross inequity to that firm. Serious hardship and gross inequity are the criteria set forth in 10 CFR 205.55(b) upon which an application for an exception may be granted.

"The conditions under which any particular firm might be able to support a finding of serious hardship or gross inequity are many and varied. For example, FEA noted in its August 3, 1976 proposal, that the enforcement of regulations concerning increased non-product cost recovery could 'have a drastic effect' on the cash resources of certain refiners. It is possible that those firms in light of all the circumstances in the case, might be able to support a claim of 'serious hardship.' FEA also noted that it intended to 'assure * * * equitable treatment for those refiners that 'properly applied the cost recovery rules.' These particular firms might find their cost recovery positions—relative to other firms—to be disadvantageous to the extent other firms are granted exceptions relief. It is also possible that these firms, depending on the other factors that exist in the case, could establish the type of inequity that constitutes a basis for exception relief. In making these types of showing, firms may, as in prior FEA exception cases, offer evidence that there was a certain degree of ambiguity in the regulations or that they acted in good faith reliance on erroneous statements contained in FEA documents as part of the total circumstances which FEA should consider in deciding the equities of their cases. However, as stated above, a showing of good faith misunderstanding, merely by itself, will not constitute a sufficient basis for relief."

*See,* 41 Fed.Reg. 43953–43954 (October 5, 1976).

The FEA also indicated that a grant of exception relief was partly dependent on the interests of consumers and other affected persons.

"Finally, in determining whether to grant exception relief in a specific case, FEA will also consider the interests of consumers and all others who may be affected by any exception relief granted. A balancing of interests and equities will be made in each case to assure that the interests of all affected parties are protected. FEA stresses that it has in no way prejudged the propriety of the activities of any firm which is participating in this proceeding. Before any final decisions are made, more detailed information. will be gathered with respect to each of the refiners seeking relief and both written comments as well as oral presentations at the public hearing will be considered in the context of individual cases."

*See,* 41 Fed.Reg. 43954, 43955 (October 5, 1976).

On November 18, 1976 the FEA, pursuant to its statutory duty under the Energy Conservation and Production Act (ECPA) of

348

1976, Pub.L. 94–385,[52] issued guidelines generally applicable to all exception proceedings before the agency.[53] These guidelines reiterate the FEA's view that exception relief is restricted to unique, individual factual circumstances. The November 18, 1976 guidelines state:

> "It is not the intention of the conferees, however, that these provisions require the FEA to anticipate all situations in which relief may be appropriate in the future, since the exceptions process is designed in substantial measure to resolve factual situations which could not have been and were not contemplated at the time the general statutory or regulatory programs were adopted. Conf.Rep., Pub.L. 91–385. CCH Fed. Energy Guidelines, Par. 10,521, at p. 10,480.
>
> "...
>
> "It should also be recognized, however, that each exception application submitted to the Federal Energy Administration must be considered on the basis of the particular factual circumstances presented in the application."

*See,* 41 Fed.Reg. 50856 (November 18, 1976).

The November 18, 1976 exception guidelines also stress that the FEA takes a particularly dim view of "retroactive" exceptions such as those which the FEA now contends are available to the plaintiffs in this case. The FEA's retroactive exception guidelines state:

> "In these applications, firms usually request a reduction in their outstanding obligations or an increase in their rights which accrued during a prior period. In addition, submissions are received in which an increase in future rights or reduction in future obligations is requested for the purpose of remedying a gross inequity or serious hardship which was experienced during a prior period. These types of applications are considered requests for retroactive exception relief. In evaluating these requests, the FEA

has consistently held that retroactive exception relief will be granted only if an applicant, in addition to satisfying the criteria applicable to all exception requests, shows compelling reasons why retroactive exception relief is warranted or that it would experience an irreparable and severe injury in the absence of retroactive exception relief.

> "...
>
> "One of the principle policy considerations underlying the FEA's stringent position concerning retroactive exceptions, is the danger that retroactive exceptions, by tending to ratify violations of the FEA Regulations, may diminish the incentive which firms in the petroleum industry have to learn the applicable law and even encourage noncompliance with the law, thereby frustrating the effectuation of important statutory objectives. The FEA's position also reflects a concern that third parties who have acted in reliance upon apparently fixed rights might be injured by the approval of retroactive relief, and that there may be a disruptive impact upon the economy if market transactions which have already occurred and established business relationships are disturbed.
>
> "In the context of considering a request for retroactive relief, the *FEA has construed severe and irreparable injury to signify such a severe financial hardship so as to preclude the firm from continuing its essential operations.*
>
> "...
>
> "*Similarly, the FEA has held that a particularly strong showing of justifiable detrimental reliance upon FEA action may furnish compelling reasons for granting retroactive exception relief.*"

*See,* 41 Fed.Reg. 50856, 50861–50862 (November 18, 1976) (emphasis added).

In November and December of 1976 a number of refiners filed petitions for exception relief from the FEA's interpretation

---

**52.** *See,* 1976 U.S.Code Congressional and Administrative News, 90 Stat. 1125, 1128 (August 14, 1976). *See also,* 15 U.S.C. § 766(i)(1)(D).

**53.** *See,* 41 Fed.Reg. 50856 (November 18, 1976).

that the petroleum price regulations governing the period January 1, 1975 through January 31, 1976 mandated a "product-cost first" sequence for passing through increased costs into market prices. Among the firms which filed such exception petitions were Exxon, Shell, and Conoco. The FEA furnished this court with copies of the Exxon and Shell petitions as attachments to the agency's motion to dismiss. Both refiners assert *inter alia*, in their petition that they should receive exception relief because their own interpretation of the applicable regulations, which in both instances coincide with the "proportional" approach, was accurate and that the language of the regulations is inconsistent with the all "product-cost first" doctrine adopted by the FEA. Exxon's exception petition, filed on November 23, 1976 pertinently states:

"Pursuant to the provisions of 10 C.F.R. § 205.50 *et seq.* and in connection with pending exception and rulemaking proceedings, Exxon Company, U.S.A., a division of Exxon Corporation (hereinafter called 'Exxon'), respectfully requests the Federal Energy Administration (hereinafter called 'FEA') to grant Exxon an exception from the FEA's interpretation of the provisions of 10 C.F.R. § 212.82, § 212.83, and § 212.87 which will recognize as proper and correct the method used by Exxon to recoup non-product cost increases during the period beginning July 18, 1974 and ending January 31, 1976.

". . .

"During the time period covered by this Application for Exception, Exxon established base prices by allocating increased product costs to May 15, 1973 prices in such amounts as were deemed appropriate in keeping with the purposes and goals of the FEA and in keeping with the purposes of and subject to the limitations in the regulations. Increased product costs not allocated to base prices were set aside, i. e., 'banked,' for recovery in future months. Increased non-product costs were then added to base prices to establish selling prices in accordance with the limits imposed by orders issued by the FEA in response to pre-notifications prior to January 1, 1975, and in accordance with the proportion of increased product costs allocated to each product after that date. This manner of allocation of increased costs was in exact compliance with the plain meaning of the words used in the regulations and in accordance with the purposes and goals of those regulations as stated at that time by the FEA.

"A requirement that increased non-product costs could not be included in setting prices until all available increased product cost had been allocated would have penalized refiners who charged prices less than the absolute legal maximum, thereby encouraging higher prices. This regulatory incentive is directly contrary to stated FEA policy objectives of moderation in pricing. Accordingly, the only basis for the FEA position is a new policy position, unstated by the FEA until 1976, that immediate use of all increased non-product costs during the period prior to February 1, 1976 was essential to the policy and goals of the FEA. . . . Therefore, the regulations would be interpreted as requiring that such increased non-product costs be recovered currently or lost. This position may not now be adopted by the FEA because:

"A. Such position is contrary to the plain meaning of the regulations issued by the FEA." [54]

The Shell exception petition asserts a similar claim:

"This application should not be construed as an admission that Shell has in any way misinterpreted, or failed to comply with, any regulation of the FEA relating to the passthrough of increased product or non-product costs. Further, this application should not be construed as an admission that the regulations at issue were lawfully promulgated or that interpretations of such regulations by

54. *See*, Exxon's Petition for an Exception, filed with the FEA on November 23, 1976, Attachment C, pp. 1, 7–8, accompanying the FEA's Motion to Dismiss.

FEA were proper, reasonable, authorized by law or substantiated by fact.

" . . .

"First, Shell's analysis of the pertinent FEA regulations and underlying statutes resulted in the proper interpretation of the regulations concerning the recovery of product and non-product cost increases. The fact that FEA personnel confirmed Shell's interpretation is further evidence of the propriety of Shell's analysis.

"The regulations promulgated in December 1974 were silent as to the specific sequence in which refiners were to account for product and non-product cost increases in computing the allowable prices for petroleum products. However, after a thorough analysis of the regulations and legislative history of the statutes authorizing the FEA to issue such regulations, Shell concluded that the regulations were intended to permit refiners to recover product and non-product cost increases on a proportionate basis." [55]

On March 17, 1977, the FEA permitted Consumers Union of the United States Incorporated, currently the *Amicus Curiae* before this court, the right to intervene at public expense as a party, representing consumer interests, in the three refiner exception proceedings initiated in the FEA's Office of Exceptions and Appeals by Exxon, Continental Oil Company (Conoco), and Southland Oil Company.[56]

On March 23, 1977, Melvin Goldstein, the Director of the FEA's Office of Exceptions and Appeals, issued a Decision and Order setting preliminary ground rules for the exception proceedings involved in this case.[57] Noting that these exception proceedings differed from the standard exception case, Mr. Goldstein indicated that "important *factual* disputes will arise with respect to the refiner exception actions, and that sworn testimony would be taken to resolve these factual conflicts.[58] Following the suggestion of the Consumers Union, Mr. Goldstein announced that the Exxon, Conoco, and Southland exception requests might be partially consolidated and should be considered first, because those three cases "appear to raise issues which are generally representative of the group. . . ." [59] The March 23, 1977 statement established the following ground rules for the refiner exception proceedings:

"With respect to the specific proceedings to be conducted in this initial group of three cases, the parties involved in the three cases will be required to establish each factual assertion in a direct manner. Although the hearing to be conducted in this matter will not be the type of hearing which is conducted on the record under the provisions of the Administrative Procedures Act, to the extent that material and substantial factual representations are disputed by other parties, oral testimony which will be subject to questioning by all other parties will be required. In order to ensure that a full presentation is made of all facets of the

**55.** *See*, Shell's Petition for an Exception, filed with the FEA on December 30, 1976, Attachment D, pp. 1, 15–16, accompanying the FEA's Motion to Dismiss.

**56.** *See*, Attachment E, pp. 3–4, accompanying the FEA's Motion to Dismiss.

**57.** *See*, Attachment F, accompanying the FEA's Motion to Dismiss, which reveals that the following refiners had filed exception petitions between November 19, 1976 and March 23, 1977:

| Name of Petitioner | Date of Filing | Case Number |
|---|---|---|
| Apco Oil Corporation | November 19, 1976 | FEE–3399 |
| Exxon Company, U.S.A. | November 23, 1976 | FEE–3417 |
| Southland Oil Company | November 30, 1976 | FEE–3448 |
| Tosco Corporation | December 3, 1976 | FEE–3467 |
| Continental Oil Company | December 15, 1976 | FEE–3520 |
| Shell Oil Company | December 30, 1976 | FEE–3545 |
| Champlin Petroleum Company | January 21, 1977 | FEE–3590 |
| Standard Oil Company of Indiana | February 16, 1977 | FEE–3708 |
| Time Oil Company | March 1, 1977 | FEE–3893 |
| Quaker State Oil Refining Corporation | March 3, 1977 | FEE–3898 |

**58.** *See*, Attachment F, pp. 2–3, accompanying the FEA's Motion to Dismiss.

**59.** *See*, Attachment F, p. 3, accompanying the FEA's Motion to Dismiss.

cases involved, the FEA Office of Regulatory Programs will also be invited to participate in these proceedings, to present relevant evidence and to question witnesses. Although the Office of Regulatory Programs will not take any position during the course of these proceedings as to the ultimate course of action which the FEA should adopt, it is our expectation that the independent analysis and data which the Office of Regulatory Programs will present may be of considerable benefit in enabling us to arrive at an appropriate resolution of these cases. Each of the parties will also be permitted to present evidence and arguments bearing on the proper application of the FEA regulatory requirements which are involved in these proceedings and the equity of applying those regulatory requirements to the firms that have filed exception applications. To the extent necessary, discovery shall also be permitted with respect to the Conoco, Exxon, and Southland cases. However, any such discovery must be directly relevant to the factual and legal issues which the parties have identified and will be required to be conducted in an expeditious manner." [60]

On March 28, 1977, Mr. Goldstein conducted a conference to discuss in greater detail the procedures to be followed during the refiner exception hearings.[61] During this conference counsel for Exxon urged that the FEA was conducting a rulemaking proceeding to determine whether the agency would retain its interpretation of the applicable regulations and suggested a stay of the exception hearing pending the conclusion of that rulemaking action. Exxon's counsel alternatively argued that if the agency was not in the process of such a rulemaking action, then it should permit the refiners to expand the scope of the exception hearings beyond a bare factual inquiry into the particular circumstances which may inflict a unique hardship or gross inequity upon particular firms. Exxon urged the FEA to allow refiners to challenge the FEA's regulatory interpretation in the exception proceedings. Mr. Goldstein, first indicated his view that the FEA had arrived at a fixed, unchallengeable interpretation of the petroleum price regulations governing the January 1, 1975 through January 31, 1976 time frame, and then permitted Exxon to condense its arguments into formal motions.[62] Before con-

**60.** *See,* Attachment F, p. 4, accompanying FEA's Motion to Dismiss. The court notes that the plaintiffs may very well be wary of voluntarily participating in exception proceedings, where the standard for relief is the highly discretionary "serious hardship or gross inequity," when they must submit themselves to broad administrative discovery on essentially the same factual and legal issues which might well be the subject of a subsequent FEA administrative *enforcement* action should the FEA's Office of Exceptions and Appeals deny all or some of the petitions for exceptions after the conclusion of the discovery phase of the exception proceedings. *See,* 10 C.F.R. § 205.106(b) (1977).

*Compare,* the predicament of Champlin Petroleum Company. At the time that discovery procedures were under discussion with respect to the FEA's exception proceedings, Champlin was defending, in the Federal District Court in Missouri, a private, civil, treble damage antitrust suit, which also contained a claim for treble damages due to alleged price overcharges arising from *Champlin's* passthrough of non-product costs. *See,* Transcript of Conference conducted on April 15, 1977, pp. 16–19, Attach-

ment M, accompanying the FEA's Motion to Dismiss. The private overcharge claim arises from the Economic Stabilization Act, 12 U.S.C. § 1904, note § 210, which authorizes such private damage suits. *Compare,* fns. 7, 9, *supra.*

**61.** *See,* Transcript of Conference, conducted on March 28, 1977, Attachment G, accompanying FEA's Motion to Dismiss.

**62.** The Transcript of Conference, pp. 16–18, 57–61, conducted on March 28, 1977, Attachment G, accompanying FEA's Motion to Dismiss, reveals the following exchanges between Exxon's counsel, Mr. File and Ms. Finney, on the one hand, and Mr. Goldstein on the other hand:

"MR. GOLDSTEIN: Let me ask at this point, are there any questions as to the type of specifications of facts and ultimate conclusions to which I have just referred.

"MR. FILE: Mr. Goldstein, I guess we have a problem knowing how to address this, and your invitation to a conference was a good idea.

"We have filed a request for exception without quite understanding what the regula-

cluding the March 28, 1977 conference, the FEA ordered Exxon and Conoco to submit, by April 8, 1977, detailed lists of the facts on which the two firms intended to rely in

tions are, with the rulemaking of FEA still in process, with court litigation going on.

"We think that we have properly complied with the regulations, and we set forth in some detail what we have done. If we are in a litigation and the parties would come out and answer, so they would deny particular allegations and admit particular allegations, we would then have issues to address.

"But as it is, we don't have any responsive pleadings, and we question whether you want us to start on page one, for example, with evidence to support each and every allegation.

"MR. GOLDSTEIN: Are you unclear, Mr. File, as to how the agency has interpreted its regulations?

"MR. FILE: I am familiar, in the request for the general exceptions, you requested companies to file requests for exceptions. I am familiar with what the preamble says is the agency's position.

"MR. GOLDSTEIN: What we are asking you to do is to assume that this is the manner in which the agency will interpret and apply the regulations. That provides us with a specification of the particular facts which would lead to the approval of exception relief with respect to Exxon, with respect to the regulation as so interpreted in the preamble.

"MS. FINNEY: Procedurally, when will we get a response to a stay of the proceedings, and a determination by the agency itself of the regulatory provision?

"MR. GOLDSTEIN: Let us talk about that in connection with the additional types of procedural matters which we might file. Let us assume, for the purpose of the present discussion, that the stay will not be granted. Does that clarification answer your question?

"MR. FILE: It would still be very helpful to know—I guess a lot of our statements are true, but no one would ask for supplementary information. We have attempted to file some supplementary information, and we have filed supplementary information which we hope will answer some of the questions.

"I have difficulty knowing what is still requested. In a normal procedure, we would hope that the Agency would say: 'Well, you have established this to our satisfaction.' We could come forth with some additional evidence.

"MR. GOLDSTEIN: Mr. File, you have filed an exception application where you have asked the agency to grant you exception relief. What we are asking you to do is to specify, in an itemization, the particular factual assertions which you think establish that you are entitled to exception relief, and a further specification of the conclusions which the agency should properly derive from those factual assertions in order to arrive at the conclusion that exception relief should be granted.

"MR. FILE: We think that we did that.

"MR. GOLDSTEIN: You have not done so to our satisfaction at the present time in the context of this present proceeding.

"What we are asking for is the type of specific itemization of factual assertions and factual representations such as I gave in my examples to Conoco and to Exxon previously. That kind of material has not been provided to date by any of the parties."
See, Transcript, supra at 16–18.

" . .

"MR. FILE: In our response today, we suggested that it was untimely to proceed in view of the lack of response on the ruling, and a lack of response in view of the pending litigation.

"I take it from what Mr. Goldstein has said that he is planning to proceed with this case without any further delay.

"MR. GOLDSTEIN: That is correct, although we will, at a very early date, make a formal determination with respect to your request for a stay. If you wish to construe it as a formal request before the FEA Office of Exceptions and Appeals.

"MR. FILE: I understood that this was a conference to discuss it. The suggestion was that we thought that it was premature until the instructions as to the regulations which are not being litigated are clear.

"MR. GOLDSTEIN: I understood that. My preliminary thoughts, upon reading the request for stay, was that it would not be granted, and the administrative proceeding should proceed for a number of reasons, one of which is that an administrative record might well be useful to any court that would consider any facet of this issue.

"As I understand it, Exxon is not presently a party to any actual litigation. Is that correct?

"MR. FILE: That is correct.

"MR. GOLDSTEIN: Even if it were, it would be my feeling that the administrative record—the administrative proceeding would provide a very useful background material for any court consideration.

"For that reason, it was my impression that these proceedings should not be stayed.

"Did you wish for your motion to be considered in a formal sense?

"MR. FILE: I think so. I have a next question.

"Assuming that the motion is denied, then are we proceeding on the basis that *the regulations as announced and as interpreted in the Federal Register*, inviting people to file requests for exceptions, *is presumed by the Office of Exceptions and Appeals as the cor-*

proving individualized hardship or gross inequity.[63]

On April 14, 1977, Mr. Goldstein issued a Decision and Order explicitly rejecting Exxon's March 28, 1977 arguments that the exception proceedings should be stayed because the FEA's rulemaking proceedings were *unconcluded* regarding the agency's interpretation of the January 1, 1975 through January 31, 1976 regulations.[64] The April 14, 1977 ruling stated:

"Exxon requests that those proceedings be stayed pending (i) the conclusion of a rulemaking proceeding pertaining to the recovery of increased non-product costs

by refiners prior to February 1, 1976 which Exxon contends has never been completed. . . .

". . .

"Exxon is incorrect in its assertion that there is an outstanding rulemaking proceeding relating to the order of recovery of increased non-product costs by refiners prior to February 1, 1976. The records of the FEA do not indicate that there is any current rulemaking proceeding with respect to the order of recovery of non-product costs. Although the FEA did indicate at one point that it was aware of

*rect interpretation. And the only question in the application for exception is whether or not, in view of that interpretation, exception should be granted.*

"MR. GOLDSTEIN: *I believe that that is correct.*

"MR. FILE: *You will not go behind the interpretation that is in the Federal Register?*

"MR. GOLDSTEIN: *We will not go behind the interpretation* of the general requirement and application of the particular regulation involved.

"*It is the position of the Federal Energy Administration that that issue has been conclusively determined in a regulatory manner through the preamble to the regulation.*

"MS. FINNEY: But that regulation did not pertain to the subject. It was a statement on the prospective change in the regulation.

"MR. GOLDSTEIN: I think that we are going into an entirely new area. If you believe that that issue should properly be considered during the course of the proceedings, I think that we can consider that in a separate motion which you might file.

"MS. FINNEY: We think that it is properly considered in the proceeding which was initiated on March 3, and—

"MR. GOLDSTEIN: That was a class exception?

"MS. FINNEY: This was a rulemaking to discuss the interpretation of the regulations in effect during the time period in question. We do not find where any final action has been taken by the FEA in that rulemaking.

"MR. GOLDSTEIN: What I will be glad to do is to reevaluate that position which I just expressed to Mr. File. If you wish to make it in a separate motion.

"It has always been my impression, and I am certainly willing to reconsider that, that the *FEA had definitively spoken as to what the prior regulations meant by publishing that preamble.*

"MS. FINNEY: *We do not think that they have.*

"MR. GOLDSTEIN: I would be willing to consider whether that issue is open, if you wish to submit that issue. It could also be covered in the 13th filing.

"MS. FINNEY: We would move that this proceeding be held in abeyance.

"MR. GOLDSTEIN: You already have moved that. The motion as of this present date is denied. If you wish the motion to be considered in a more formal sense, and to be responded to by the issuers of the formal decision and order, we will be glad to do so. Do you wish that to occur?

"MS. FINNEY: You say that the motion is denied now.

"MR. GOLDSTEIN: The motion is denied in terms of staying the filing of the documents which I have indicated."

*See,* Transcript of Conference, *supra* at 57–61. (emphasis added).

63. *See,* Transcript of Conference conducted on March 28, 1977, p. 43, Attachment G, accompanying FEA's Motion to Dismiss. The court notes that Southland Oil Company was not represented during the March 28, 1977 Conference and that its exception petition was "dismissed because FEA determined that it had been filed prematurely. Southland stated that it had complied with the applicable FEA regulatory requirements during the period in question and its Application consisted only of a request that it receive equitable treatment in light of any action which the FEA might take in exception proceedings initiated by other firms which failed to comply with the FEA regulations." *See* FEA's Notice, p. 5, announced April 21, 1977, Attachment N, accompanying the FEA's Motion to Dismiss.

64. *See,* FEA's Decision and Order on Exxon's Application for Stay, FEA Case No. FES–0091, issued April 14, 1977, pp. 3–4, Attachment L, accompanying the FEA's Motion to Dismiss.

the problems that certain refiners could experience as a result of the regulatory requirement that non-product cost increases be recovered prior to February 1, 1976 only after all product cost increases had been implemented, the agency specifically decided that it would not attempt to resolve those possible difficulties through a rulemaking proceeding but would instead utilize other available mechanisms. This intent is directly manifested in a Notice which it published in the Federal Register on October 5, 1976 regarding a class exception which had previously been proposed and which, if granted, would permit certain refiners to compute their recovery of increased non-product costs during 1975 and January of 1976 in a manner different from that required by the FEA Regulations. In that Notice the FEA stated that:

" 'In the August 3, 1976 notice of this proposed class exception, FEA reaffirmed that *the interpretation which was issued on February 1, 1976 of the November 29, 1974 regulations is correct, i. e., increased product costs were required to be recovered* first and banking of unrecovered increased non-product costs was not permitted. FEA wishes to emphasize that it fully intends to enforce this interpretation of the regulations in all instances other than those in which a firm has applied for and been granted relief by FEA's Office of Exceptions and Appeals. 41 Fed.Reg. 43953 (October 5, 1976).'

"*The October 5, 1976 Notice is a reasonably clear indication that the FEA was not considering revisions to the refiner pricing regulations governing the recovery of increased costs prior to February 1, 1976 and that the FEA would adhere to the interpretation of the regulations which it had previously enunciated.* The Notice in fact encouraged refiners to file Applications for Exception from those regulations. Under the circumstances, Exxon's contention that it is inappropriate for the FEA to conduct ex-ception proceedings at this time should be rejected since that is the very mechanism which the FEA stated it would use in resolving any previous difficulties which it noted certain refiners might experience." (emphasis added).[65]

The same April 14, 1977 FEA decision rejected Exxon's motion to permit administrative litigation, in the exception proceedings, on the correctness of the FEA's interpretation of the regulations governing the January 1, 1975 through January 31, 1976 period. The order states:

"In its submission, Exxon also asserts that the FEA has unreasonably limited the scope of the exception proceedings. The firm claims that, despite the FEA's failure to decide through a rulemaking whether a particular method of recovery of increased non-product costs should apply to the January 1, 1975 through January 31, 1976 period, the FEA Office of Exceptions and Appeals during the course of the March 28, 1977 hearing indicated that it would not consider the issue of the proper interpretation of the relevant regulatory provisions or whether that interpretation is reasonable. Exxon contends that, in view of the sever restrictions that the FEA Office of Exceptions and Appeals intends to impose upon the scope of the issues that may be raised in the proceedings, it does not believe that it should participate in the proceedings at this time.

"In the March 28, 1977 hearing the Director of the Office of Exceptions and Appeals did express his preliminary view that the preamble to the February 1, 1976 amendments to the refiner pricing regulations established that during 1975 and January of 1976 refiners were required to regard increased product costs as having been recovered prior to the recovery of any increased non-product costs and only increased product costs could be carried forward for recovery in a subsequent month. *Official Transcript of Proceedings, supra,* p. 59. However, he also indicated that, if Exxon did not believe that

---

65. *See,* Attachment L, pp. 1, 3–4, accompanying FEA's Motion to Dismiss.

the preamble to the February 1, 1976 amendments was determinative of the FEA's view of the proper interpretation of the regulatory requirements, Exxon could file a motion that the FEA rule that the issue was still open. *Id.,* pp. 59–60. The Office of Exceptions and Appeals stated that it would receive and consider such a filing. *Id.,* pp. 59–60. In view of the fact that Exxon has been afforded the opportunity to have its position with respect to this matter fully considered, we find no basis for the firm's assertion that the scope of the exception proceedings has been unduly limited. Moreover, Exxon has asserted that, even if the preamble is regarded as determinative of the FEA's view of the proper interpretation of the regulatory requirements, the firm will establish that the application of those requirements to its particular situation constitutes a gross inequity. Thus, even if the issue as to whether the preamble is determinative is not considered, the scope of the exception proceedings would not be unduly limited." [66]

One day after the denial of its motion, Exxon's counsel sent the following letter to the FEA's Office of Exceptions and Appeals indicating Exxon's withdrawal of its exception petition.

"In view of the decision and order entered in the matter of Exxon Company, U.S.A., FES–0091, on April 14, 1977, denying the motion to stay the proceedings, we hereby confirm Exxon's withdrawal, effective April 7, 1977, from the above referenced proceeding." *See,* Letter dated April 15, 1977, Attached to Exxon's Complaint.

Mr. Goldstein issued the following telegram in response to Exxon's withdrawal:

"On April 15, 1977 the Office of Exceptions and Appeals of the Federal Energy Administration received a letter in which Mr. Donald Craven of the law firm of Miller & Chevalier purports to unilateral-

ly withdraw an application for exception which his client, Exxon Company, U.S.A., filed with the Federal Energy Administration on November 23, 1976 (Case No. FEE–3417). In view of the present posture of the Exxon submission, Exxon does not have the unilateral right to withdraw its submission without prejudice. Consequently, we are hereby convening a hearing at 2:15 p. m. on Tuesday, April 19, 1977 at Room 8002, 2000 M Street, N.W., Washington, D.C. to hear oral arguments from the parties as to the course of action which the FEA should adopt with respect to Exxon's refusal to participate in that exception proceeding. Among the possible courses of action which will be considered will be: (i) the approval of the Exxon request that the FEA dismiss the exception application without prejudice; (ii) dismissal of the Exxon application with prejudice on the grounds that, despite ample opportunity to do so, Exxon has willfully failed to proceed in accordance with the procedures established in the exception proceeding; and (iii) denial of the Exxon exception application on the merits on the grounds that Exxon, after having been provided ample opportunity to do so, has failed to substantiate through the submission of factual evidence the assertions which it advances in its exception application."

*See,* Transcript of Conference conducted on April 15, 1977, pp. 6–7, Attachment M, accompanying the FEA's Motion to Dismiss.

On April 15, 1977 Mr. Goldstein presided over a second conference dealing with the procedures to be followed at the exception hearings. At this conference Conoco moved the Office of Exceptions to stay its administrative exception proceedings until judicial resolution of the cases now pending before this Ohio federal court and similar litigation pending in the Delaware federal court.[67] The agency denied Conoco's motion for a

---

**66.** *See,* Attachment L, pp. 7–8, accompanying the FEA's Motion to Dismiss.

**67.** *See,* Transcript of Conference, pp. 8–10, Attachment M, accompanying the FEA's Motion to Dismiss.

stay of administrative procedures citing the April 14, 1977 ruling on Exxon's motions.[68]

On April 21, 1977 the FEA issued an order further delineating the procedure under which the FEA expected to conduct the exception hearings.[69] The April 21, 1977 notice, reiterated the FEA's belief in the validity of the agency's interpretation of the applicable regulations, and concluded with the announcement of the new rule that all exception petitions relating to the "product-cost first" rule governing the January 1, 1975 through January 31, 1976 time frame had to be filed with the Office of Exceptions and Appeals within sixty (60) days after April 21, 1977. The sixty (60) day deadline notice pertinently states:

"During the period from January 1, 1975 through January 31, 1976 the FEA Mandatory Petroleum Price Regulations required refiners to regard increased crude oil and purchased *product costs* ('product costs') as having been *recovered prior to the recovery of any increased non-product costs* ('sequential recovery') in calculating the amount of increased non-product costs they had recovered. These calculations are an essential element in determining the maximum permissible selling prices which it sells and the amount of increased product costs that is available to be carried forward as 'banked' costs for recovery in future periods. The applicable regulations during this period of time prohibited the banking of unrecovered increased non-product costs. 10 CFR 212.83(e)(9) (deleted in 41 Fed.Reg. 15330 (April 12, 1976)). Thus, all increased product costs incurred by a firm were required to be passed through before the firm could increase its prices to reflect any increased non-product costs. In addition, any increased non-product costs which were not recovered in the month subsequent to the month in which they were incurred could not be

reflected in the selling prices charged in subsequent months. The FEA Regulations also provided that a refiner could pass through its increased non-product costs only if its profit margin in the current fiscal year did not exceed its base period profit margin. 10 CFR 212.11 (deleted in 41 Fed.Reg. 9087 (March 3, 1976)).

" . . .

"The FEA has determined that a limit should be placed upon the period of time in which refiners will be permitted to file Applications for Exception from the FEA regulatory provisions which governed the order of recovery of increased non-product costs by refiners during the period from January 1, 1975 through January 31, 1976. In a notice published in the Federal Register on February 4, 1976, the FEA explicitly set forth its interpretation of those regulations. Thus, firms which believe that they may experience difficulties as a consequence of that interpretation have been on notice for over a year of their need to seek exception relief. The FEA reaffirmed its interpretation in the notice which it issued on August 3, 1976. 41 Fed.Reg. 33282 (August 9, 1976). In addition, the notice which the FEA issued on September 30, 1976 and the statements made by the FEA at the October 13, 1976 hearing informed firms that they must file individual exception applications if they wished to obtain administrative relief from the sequential recovery provisions. Since the dates of that notice and hearing refiners have had more than six months to request exception relief. Moreover, on the basis of the principles discussed in a Decision which it issued on April 14, 1977 denying an Application for Stay which Exxon Company, U.S.A. submitted (*Exxon Co., U. S. A.,* 5 FEA Par. —— (April 14, 1977)), there

---

**68.** *See,* Transcript of Conference, pp. 10–11, Attachment M, accompanying the FEA's Motion to Dismiss.

**69.** *See,* FEA's "Notice of Deadline for Filing Applications for Exception from Refiners Price Rules Governing Order of Recovery of In-

creased Non-Product Costs during Period January 1, 1975 through January 31, 1976," issued April 21, 1977, Attachment N, accompanying the FEA's Motion to Dismiss. *See also,* 42 Fed.Reg. 21315 (April 26, 1977).

appears to be no valid reason why the FEA should further delay its determination of exception applications from these regulatory provisions. Additional delay could also adversely affect the substantial interest which the FEA has already recognized consumers have in these matters.

" . . .

"In view of the lengthy period of time which has elapsed since the FEA stated its sequential recovery interpretation and invited the submission of individual exception requests, it has been determined that 60 days would afford a reasonable opportunity to file exception applications." (Emphasis added).[70]

On April 27, 1977 this court, acting pursuant to an agreement between the parties, issued its order staying the administrative exception proceedings.[71]

## III.

## THIS CASE PRESENTS LEGAL ISSUES WHICH ARE RIPE FOR IMMEDIATE JUDICIAL DETERMINATION

A. CONGRESS EXPRESSED NO INTENTION TO PRECLUDE PRE–ENFORCEMENT REVIEW OF FINAL FEA DECISIONS.

 The FEA contends that none of the issues raised in the complaints filed by the nine plaintiff refiners satisfy the ripeness requirement of Article III of the United States Constitution, as that provision has been construed by federal courts which have considered the question of pre-enforcement review of federal regulatory agencies' decisions. In *Abbott Laboratories Inc. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), Justice Harlan, writing for the majority, set forth the dimensions of the ripeness doctrine as it applied to pre-enforcement judicial review of administrative actions. Under *Abbott Laboratories* no federal court may entertain a pre-enforcement declaratory judgment action against a federal agency to which Chapter 7 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, applies if the Congress intended to prohibit such judicial review. Thus, Justice Harlan wrote:

"The first question we consider is whether Congress . . . intended to forbid pre-enforcement review of this sort of regulation . . .. The question is phrased in terms of 'prohibition' rather than 'authorization' because a survey of cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress.

" . . .

"Early cases in which this type of judicial review was entertained . . . have been reinforced by the enactment of the Administrative Procedure Act, which embodies the basic presumption of judicial review to one *'suffering legal wrong* because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702, so long as no statute precludes such relief or the action is not

---

**70.** *See,* FEA's "Notice," Attachment N, pp. 1–2, 5–8, accompanying FEA's Motion to Dismiss. *See also,* 42 Fed.Reg. 21315, 21316 (April 26, 1977).

**71.** *See,* fn. 5, *supra.* On June 28, 1977, the FEA published the following notice in the Federal Register:

"AGENCY: Federal Energy Administration.

"ACTION: Vacating Filing Deadline.

"SUMMARY: The June 27, 1977 deadline for filing Applications for Exception is vacated until further notice is issued by FEA.

" . . .

"SUPPLEMENTARY INFORMATION: On Tuesday, April 26, 1977, FEA issued a notice in the Federal Register which set forth a deadline of June 27, 1977 for filing Applications for Exception from the regulatory provisions which governed the order of recovery of increased non-product costs by refiners during the period of January 1, 1975 through January 31, 1976. During the course of litigation involving these regulatory provisions, FEA agreed to stay this requirement temporarily with respect to all refiners and until further notice.

"Issued in Washington, D.C., June 23, 1977."

42 Fed.Reg. 32831 (June 28, 1977).

358

one committed by law to agency discretion, 5 U.S.C. § 701(a). The Administrative Procedure Act provides specifically not only for review of '[a]gency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court,' 5 U.S.C. § 704." *Abbott Laboratories, supra* at 139–141, 87 S.Ct. at 1510 (emphasis added).

Furthermore, under *Abbott Laboratories,* a federal court may find a Congressional intent to prohibit pre-enforcement declaratory relief only when the statutory language, or legislative history demonstrate such an intent by "clear and convincing" language. *See, Abbott Laboratories, supra* at 141, 87 S.Ct. 1507; Jaffe, *Judicial Control of Administrative Actions,* 336–359 (1965).

The FEA, arguing that *Abbott Laboratories'* recognition of the reviewability of final agency decisions depends on whether Chapter 7 of the Administrative Procedure Act (APA) applies to the agency against which the pre-enforcement action is directed, notes that it is not governed by those provisions of the APA,[72] and concludes that it thereby enjoys a Congressionally recognized exemption from the *Abbott Laboratories* ripeness doctrine.

This court disagrees with the FEA's assertion that the *Abbott Laboratories* doctrine only applies to agencies covered by the APA. The above recitation from that decision does not state that the applicability of the APA is a requirement for pre-enforcement judicial review of agency decisions, but rather cites the APA as *reinforcement* of the earlier judicial doctrine that in an appropriate case, pre-enforcement review of a final agency decision is permissible. Furthermore, the Economic Stabilization Act specifically recognizes that,

"Any person *suffering legal wrong* . . arising out of this title, or order, or regu-

lation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief . . ." *See,* 12 U.S.C. § 1904, note § 210(a) (emphasis added).

The *"suffering legal wrong"* language of the APA, 5 U.S.C. § 702, is identical to the *"suffering legal wrong"* operative language embodied in § 210(a) of the Economic Stabilization Act, which controls this case.[73] Thus, unless there is an indication of Congressional intention to preclude such review stated elsewhere in the statute or legislative history, this court must confidently conclude that § 210(a), like § 702, *reinforces* the Supreme Court's early case law, recognizing "the basic *presumption of judicial review* to one 'suffering legal wrong' because of" final decisions of agencies such as the FEA. *See, Abbott Laboratories, supra* at 140, 87 S.Ct. 1507.

■ The additional judicial review provisions of the Economic Stabilization Act support the theory that Congress has not precluded pre-enforcement, declaratory judgment attacks on final FEA decisions. Section 211(a)[74] provides that the district courts "shall have exclusive original jurisdiction of cases or controversies arising under this title or under regulations or orders issued thereunder. . . ." Section 211(b)[75] creates the Temporary Emergency Court of Appeals and gives it appellate jurisdiction of all § 211 cases. Section 211(d)(2)[76] authorizes a district court to enjoin the application of a particular regulation to a party to litigation before it. Section 211(e)(1)[77] endows a district court with jurisdiction "to declare . . . that a regulation . . . is in excess of the agency's authority, is arbitrary or capricious, or otherwise unlawful under the criteria" for judicial review set forth in 5

**72.** *See,* 12 U.S.C. § 1904, note § 207(a).

**73.** *See,* 15 U.S.C. § 753(a), and fn. 9 on p. 332, *supra* of this Memorandum of Opinion. *See also,* fn. 84, *infra.*

**74.** *See,* 12 U.S.C. § 1904, note § 211(a).

**75.** *See,* 12 U.S.C. § 1904, note § 211(b).

**76.** *See,* 12 U.S.C. § 1904, note § 211(d)(2).

**77.** *See,* 12 U.S.C. § 1904, note § 211(e)(1).

U.S.C. § 706(2).[78] The plain meaning of the Economic Stabilization Act contains no suggestion that Congress intended to preclude pre-enforcement review of FEA decisions.[79]

The Federal Energy Administration Act, Pub.L. 93–275, § 766(i)(2)(B), of Title 15, furnishes additional statutory authority for judicial review of the FEA's final decisions, unfettered by a Congressional intention to preclude pre-enforcement judicial examination. That section provides:

"Notwithstanding the amount in controversy, the district courts of the United States shall have exclusive original jurisdiction of all other cases or controversies arising under this chapter, or under rules, regulations, or orders issued thereunder, except any actions taken to implement or enforce any rule, regulation, or order by any officer of a State or local government agency under this chapter: *Provided*, That nothing in this section affects the power of any court of competent jurisdiction to consider, hear, and determine in any proceeding before it any issue raised by way of defense (other than a defense based on the unconstitutionality of this chapter or the validity of action taken by any agency under this chapter). If in any such proceedings an issue by way of defense is raised based on the unconstitutionality of this chapter or the validity of agency action under this chapter, the case shall be subject to removal by either party to a district court of the United States in accordance with the applicable provisions of chapter 89 of Title 28. Cases or controversies arising under any rule, regulation, or order of any officer of a State or local government agency may be heard in either (1) any appropriate State court, or (2) without regard to the amount in controversy, the district courts of the United States." *See*, in addition, 15 U.S.C. § 767(f).

Likewise, the legislative history of §§ 210 and 211 of the Economic Stabilization Act, Pub.L. 92–210,[80] the Emergency Petroleum Allocation Act, Pub.L. 93–159,[81] and the Federal Energy Administration Act, Pub.L. 93–275,[82] contain no suggestion that Congress intended to preclude pre-enforcement, declaratory judgment, judicial review of the FEA's final decisions. *See*, 1971 U.S. Code Congressional and Administrative News, Legislative History for Pub.L. 92–210, pp. 2289–2290, 2292–2294; 1973 U.S. Code Congressional and Administrative News, Legislative History for Pub.L. 93–159, pp. 2674, 2676–2679; 1974 U.S. Code Congressional and Administrative News, Legislative History for Pub.L. 93–275,[83] p. 2977.

---

**78.** The criteria set out in 5 U.S.C. § 706(2) are: "The reviewing court shall—

". . . .

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

"(B) contrary to constitutional right, power, privilege, or immunity;

"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

"(D) without observance of procedure required by law;

"(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

"(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

**79.** "[W]here the act is clear upon its face, and when standing alone it is fairly susceptible of but one construction, that construction must be given to it. . . ." *Hamilton v. Rathbone*, 175 U.S. 414, 419, 20 S.Ct. 155, 157, 44 L.Ed. 219 (1899). *See also, The Firestone Tire and Rubber Company v. William T. Coleman, Jr., et al.*, 432 F.Supp. 1359, 1362 fn. 2 (N.D.Ohio 1976).

**80.** *See*, 1971 U.S. Code Congressional and Administrative News, p. 837; 85 Stat. 743.

**81.** *See*, 1973 U.S. Code Congressional and Administrative News, p. 693; 87 Stat. 627.

**82.** *See*, 1974 U.S. Code Congressional and Administrative News, p. 106; 88 Stat. 96.

**83.** The Legislative History for Pub.L. 93–275 pertinently states:

"The House bill and the Senate amendment differed with respect to appeals from general administrative rulemaking. The conference substitute, in section 7(i)(2), adopts the House language with technical amendments

Finally, the Temporary Emergency Court of Appeals has repeatedly permitted pre-enforcement judicial review of FEA decisions, thus implicitly recognizing that Congress never .expressed an intention to preclude such review. *See, Atlantic Richfield Company v. Federal Energy Administration, et al.,* 556 F.2d 542, 553, fn. 26 (Em.App., 1977) (expressly applying *Abbott Laboratories, supra* to a pre-enforcement action brought to attack an FEA regulatory "interpretation" [84]); *Shell Oil Company v. Federal Energy Administration,* 400 F.Supp. 964, 967–968 (S.D.Texas, 1975), aff'd. 527 F.2d 1243 (Em.App., 1976) (527 F.2d at 1245, characterizing the district court's decision as "a perceptive and well reasoned memorandum opinion"); *Pacific Coast Meat Jobbers Association Incorporated, et al. v. Cost of Living Counsel,* 481 F.2d 1388, 1389–1390 (Em. App., 1973) (exception proceedings not exhausted at time the Temporary Emergency Court of Appeals decided the case on its merits); *Gulf Oil Corporation v. Simon,* 502 F.2d 1154, 1155–1157 (Em.App., 1974).

Therefore, this court concludes that the ripeness doctrine, as expressed in *Abbott Laboratories, supra,* applies to the plaintiff's claims, and that *Congress has expressed no intention* whatsoever to preclude pre-enforcement, declaratory judgment, judicial review of the FEA's final decisions.

to make clear that with respect to judicial review of general rulemaking under the act, actions taken pursuant to the Emergency Petroleum Allocation Act of 1973 will continue to follow the special procedures provided in the Allocation Act for facilitating appeals through the use of the Temporary Emergency Court of Appeals. This clarification comports with the provisions in section 7(i)(2)(B), adopting language in both the House bill and the Senate amendment, which provides that the *U.S. district courts shall have jurisdiction over all other cases or controversies arising under the Federal Energy Administration Act.* Appeals from the district courts in cases involving Allocation Act matters presently go to the Temporary Emergency Court of Appeals, and nothing in either the House bill, Senate amendment, or conference substitute alters this procedure." 1974 U.S. Code Congressional and Administrative News, p. 2977 (emphasis added).

## B. THE ISSUE OF THE VALIDITY OF THE FEA'S PRESENT INTERPRETATION OF THE INCREASED COST PASSTHROUGH REGULATIONS GOVERNING THE PERIOD JANUARY 1, 1975 THROUGH JANUARY 31, 1976 IS CURRENTLY FIT FOR JUDICIAL REVIEW.

The second element of the ripeness test expressed in *Abbott Laboratories, supra* is whether the issues which the pre-enforcement plaintiff raises in response to the agency's decision are fit for judicial decision. *See, Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. 1507. In that case, 37 drug manufacturers and their Pharmaceutical Manufacturing Association filed a pre-enforcement declaratory judgment action attacking a Federal Drug Administration (FDA) regulation, promulgated under the authority of 21 U.S.C. §§ 352, 371, which required all drug manufacturers to accompany the printing of the "proprietary name" on their drug product packages with a comparable printing of the FDA's "established [*i. e.,* generic] name" for that drug. The *Abbott Laboratories* plaintiffs alleged that the challenged regulation exceeded the authority delegated to the FDA by Congress under 21 U.S.C. §§ 301 *et seq.,* 352, 371. *See, Abbott Laboratories, supra,* 387 U.S. at 138, 149, 87 S.Ct. 1507, 1515, fn. 16; 21 C.F.R. § 1.104(g)(1) (1963). The United States Supreme Court stressed the follow-

84. *Atlantic Richfield, supra,* 556 F.2d, at 552, pertinently provides:

"The reviewability of the interpretations in question in their proper meaning is rendered clear by *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). As there said, 'judicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.' The Administrative Procedure Act provides not only for review of '[a]gency action made reviewable by statute,' but also for review of 'final agency action for which there is no other adequate remedy in a court.' 5 U.S.C. § 704. And the Economic Stabilization Act, 12 U.S.C. § 1904 note §§ 210, 211, as incorporated into the Emergency Petroleum Allocation Act, reinforces that right here."

*Compare* text accompanying fn. 73, *supra.*

ing factors in holding that the drug industry's pre-enforcement declaratory judgment challenge to that regulation was fit for judicial review:

> "First, all parties agree that the issue tendered is a *purely legal one* : whether the statute was properly construed by the Commissioner to require the established name of the drug to be used *every time* the proprietary name is employed. [emphasis in original in part]
>
> " . . .
>
> "Second, the regulations in issue we find to be *'final agency action.'* . . .
>
> " . . ."

The cases dealing with judicial review of administrative actions have interpreted the "finality" element in a *pragmatic* way:

> "Thus in *Columbia Broadcasting System v. United States,* 316 U.S. 407 [62 S.Ct. 1194, 86 L.Ed. 1563], a suit under the Urgent Deficiencies Act, 38 Stat. 219, this Court held reviewable a regulation of the Federal Communications Commission setting forth certain proscribed contractual arrangements between chain broadcasters and local stations. The FCC did not have direct authority to regulate these contracts, and its rule asserted only that it would not license stations which maintained such contracts with the networks. Although no license had in fact been denied or revoked, and the FCC regulation could properly be characterized as a statement only of its intentions, the Court held that *'Such regulations have the force of law before their sanctions are invoked as well as after. When as here they are promulgated by order of the Commission and the expected conformity to them causes injury cognizable by a court of equity, they are appropriately the subject of attack * * *'* 316 U.S., at 418–419 [62 S.Ct. at 1201].

> "Two more recent cases have taken a similarly *flexible view of finality.* In *Frozen Food Express v. United States,* 351 U.S. 40 [76 S.Ct. 569, 100 L.Ed. 910], at issue was an Interstate Commerce Commission order specifying commodities that were deemed to fall within the statutory class of 'agricultural commodities.' Vehicles carrying such commodities were exempt from ICC supervision. An action was brought by a carrier that claimed to be transporting exempt commodities, but which the ICC order had not included in its terms. Although the dissenting opinion noted that *this ICC order had no authority except to give notice of how the Commission interpreted the Act and would have effect only if and when a particular action was brought against a particular carrier, and argued that 'judicial intervention [should] be withheld until administrative action has reached its complete development,'* 351 U.S., at 45 [76 S.Ct. at 572], the Court held the order reviewable.

> "Again, in *United States v. Storer Broadcasting Co.,* 351 U.S. 192 [76 S.Ct. 763, 100 L.Ed. 1081], the Court held to be a final agency action within the meaning of the Administrative Procedure Act an FCC regulation announcing a Commission policy that it would not issue a television license to an applicant already owning five such licenses, even though no specific application was before the Commission. The Court stated: *'The process of rulemaking was complete. It was final agency action * * * by which Storer claimed to be "aggrieved." ' * 351 U.S. at 198 [76 S.Ct. at 768].

> "We find decision in the present case following *a fortiori* from these precedents. The regulation challenged here, *promulgated in a formal manner after announcement in the Federal Register* and consideration of comments by interested parties is quite clearly definitive. There is *no hint that this regulation is informal . . . or only the ruling of a subordinate official . . . or tentative.* It was made effective upon publication, and the Assistant General Counsel for Food and Drugs stated in the District Court that compliance was expected." *See, Abbott Laboratories,* 387 U.S. at

149–151, 87 S.Ct. at 1516 (emphasis added in part and in the original in part).[85] Thus, under *Abbott Laboratories, supra,* any administrative decision is fit for pre-enforcement judicial review if the decision is *"purely legal,"* and "final," in the sense that it: (1) has the "force of law before [its] sanction [is] invoked, as well as after," thereby "giv[ing] notice of" the agency's interpretation; (2) is "promulgated by order of" the agency, "in a formal manner after announcement in the Federal Register," after "the process of rulemaking was complete;" (3) is not "tentative," or only the ruling of a subordinate official. *See also, Toilet Goods Association v. Gardner,* 387 U.S. 158, 162–164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (holding that an FDA regulation, which stated that a cosmetic firm which refused to permit FDA agents to inspect its facilities on demand "may" immediately have its FDA certification suspended to be a final administrative decision, but not ripe for pre-enforcement judicial review on *other* grounds); *Gardner v. Toilet Goods Association,* 387 U.S. 167, 170–171, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).[86] In *National Automatic Laundry and Cleaning Council . v. Shultz,* 143 U.S.App.D.C. 274, 276–277, 285–286, 443 F.2d 689, 691–692, 700–701 (1971) (Leventhal, J.) the court amplified the *Abbott Laboratories* finality and fitness for judicial review "ripeness" doctrine by holding that a letter-decision signed by the chief executive officer of a federal agency, authoritatively set forth an agency's position on a question of law, and thereby constituted a "final" decision which, in an appropriate case, was reviewable in a pre-enforcement declaratory judgment action even though the letter-decision was not formally issued. The Temporary Emergency Court of Appeals applying the *Abbott Laboratories* doctrine *sua sponte* to a pre-enforcement declaratory judgment action seeking judicial review of an FEA regulatory *interpretation,* incorporated *National Automatic Laundry's* expression of the fitness for review component of the ripeness doctrine when it wrote in *Atlantic Richfield, supra,* 556 F.2d 542, 553, fn. 27 (Em.App., 1977):

"The interpretation of the [FEA] Administrator 'was a broad legal one based upon the underlying effect of amendments'; there was involved 'a broad ruling *on legal issues* that are appropriate for court consideration' instead of 'the kind of ruling that must wait and turn on developments of specific fact situations'; there was 'no problem of identifying or refining pertinent facts* insofar as the Court is called upon to consider the validity of the Administrator's interpretation'; '[t]here is *no record* to be studied or made; for *the only record involved in this issue is that established by such materials as the law and its legislative history*'; there was involved a 'controversy that was real and suitable for determination of the issue, suitable in such terms as the identity and reference points of the parties and the perspective they provide by their record', and based on something other than a hypothetical inquiry; the

---

**85.** *Abbott Laboratories* reliance on the *finality* requirement of the APA does not diminish the precedential value of that case in the context of FEA regulations, despite Congress' decision to exempt the FEA from many of the strictures of the APA. *See,* fn. 84, *supra.*

**86.** In *Gardner v. Toilet Goods Association, supra,* 387 U.S. at 171, 87 S.Ct. at 1528, the court noted:

"We agree with the District Court and the Court of Appeals that this is not a situation in which consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to enforce the regulations. Rather, 'to the extent that they purport to apply premarketing requirements to broad catego-

ries like finished products and non-coloring ingredients and define the hair-dye exemption, they appear, *prima facie,* to be susceptible of reasoned comparison with the statutory mandate without inquiry into factual issues that ought to be first ventilated before the agency.' "

Similarly, in this case, the court sees little to be derived from further FEA consideration of the validity of its interpretation of the applicable regulations, because the FEA has maintained the same position on that question since February 1, 1976, over a year before this court stayed the administrative proceedings, and because the FEA has repeatedly published its reasons for its interpretation. *See,* fns. 89 and 91, *infra,* and accompanying text.

*decision* had finally been made *by the head of the agency* and *not* subordinates, the *administrative inquiry had come to an end,* and there was no fair basis in saying that the process would disrupted by judicial review. *National Automatic* [143 U.S.App.D.C. at 280–281, 443 F.2d] at 695–96." (emphasis added).

All nine of the refiner plaintiffs in this case allege in their complaints that: (1) the agency's interpretation, that the regulations governing the time frame January 1, 1975 through January 31, 1976 mandate the passthrough of all product costs before any non-product costs may be passed through into price increases, is refuted by the language of the regulations themselves; (2) if the FEA's interpretation of the applicable regulations is semantically accurate, then those regulations, as glossed by the agency's interpretation, violate the applicable procedural statutes and the "dollar for dollar passthrough" provisions embodied in both the EPAA, Pub.L. 93–159, § 4(b)(2)(A), 1973 U.S. Code Congressional and Administrative News, p. 695, and the EPCA, 15 U.S.C. § 753(b)(2)(A) (Supp., 1977).[87]

These two issues are purely legal, requiring no factual determinations whatsoever. On the first issue, the court need only examine the language of the applicable regu-

lations, in the context of the congressional intent behind the applicable statutes, and the relevant regulatory decisions issued during the period January 1, 1975 through January 31, 1976, in order to decide whether the agency's February 1, 1976 decision comports with those documents. *See, National Automatic Laundry, supra,* 143 U.S.App. D.C. at 280–281, 443 F.2d at 695–696 ("there is no 'record' to be studied or made; for the only record involved in this issue is that established by such materials as the law and the legislative history"); *Atlantic Richfield, supra,* at 553, fn. 27 (quoting the language from *National Automatic Laundry, Id.* as authoritative); *American Nursing Home Association v. Cost of Living Counsel,* 497 F.2d 909, 912, 913 (Em.App. 1974) (no administrative exhaustion required on the issue of whether CLC regulations conflict with 42 U.S.C. §§ 1395, *et seq.,* 1396, *et seq.,* and therefore merits of the *legal* question reached by the district and appellate court).[88]

Assuming *arguendo* that this court should find the FEA's interpretation of the applicable regulations semantically correct, the second issue of whether such regulations are consistent with the agency's power under the controlling substantive and procedural statutes necessitates no judicial factu-

---

**87.** *See, Standard Oil of Ohio's* Complaint, C76–1279, Prayer for Relief, ¶ (A)(2); *Sun Oil's* Complaint, C76–1288, Prayer for Relief, ¶¶ 1, 2; *Mobil Oil's* Complaint, C76–1344, Prayer for Relief, ¶¶ 1, 2, 3, 5; *Texaco's* Complaint, C77–11, ¶ 15(a), Prayer for Relief, ¶ 1; *Gulf Oil's* Complaint, C77–82, ¶ 42(a), Prayer for Relief, ¶ A; *Shell Oil's* Complaint, C77–92, Prayer for Relief, ¶ 2; *Amoco Oil's* Complaint, C77–168, Prayer for Relief, ¶ (A), only insofar as it requests this court "to declare that Amoco's proportional cost recoveries during the relevant period was proper and lawful under the applicable statutes and regulations. . . .'" *Atlantic Richfield's* Complaint, C77–187, Prayer for Relief, ¶ 1; *Exxon's* Complaint, C77–406, ¶¶ 28(e), 31(f), Prayer for Relief, ¶ 1.

**88.** The Temporary Emergency Court of Appeals assessed the district court's opinion in the following fashion:
"The reasoning of the district court in concluding that it should hear and decide the two issues is stated as follows:
" 'The Court can interpret and rule on this conflict between regulation and statute as cogently as the agency and therefore the

Court does not feel constrained to dismiss the complaint for failure to exhaust administrative remedies. If this were a matter where agency expertise was required or the plaintiff was trying to short-circuit the administrative process and an administrative record would be of benefit, the Court would hold differently.'
"While this is a correct statement of the rule to be applied in passing upon the exhaustion requirement, the district court used it correctly only for the statutory construction issue and not for the question of whether the regulations were arbitrary and capricious.
"The exhaustion doctrine is a practical one designed to increase both judicial and administrative efficiency. The most important factor in its application is, therefore, the one stated by the district court, whether 'an administrative record would be of benefit' to proper resolution of the issues in controversy." *See, American Nursing, supra,* 497 F.2d at 912–913.

al inquiry, and is likewise a purely legal question under the controlling case law. *See, Abbott Laboratories, supra,* 387 U.S. at 139, 149, 87 S.Ct. 1507; *Toilet Goods Association Incorporated, et al. v. Gardner, supra,* 387 U.S. at 161–162, 87 S.Ct. 1520; *Gardner v. Toilet Goods Association, supra,* 387 U.S. at 169–170, 87 S.Ct. 1526; *Atlantic Richfield, supra,* at 553; *National Automatic Laundry, supra,* 143 U.S.App.D.C. at 280–281, 443 F.2d at 695–696.

Furthermore, this case is now fit for judicial review because the two purely legal questions raised by the plaintiffs both arise out of the FEA's *final interpretive decision* that the applicable regulations embodied an "all product-costs first" rule during the January 1, 1975 through January 31, 1976 time frame. In the fourteen month period, February 1, 1976 through April 27, 1977, the FEA consistently, and repeatedly maintained that is "product-cost first" interpretation constituted the valid construction of the applicable regulations.[89] Just as in *National Automatic Laundry, supra,* 143 U.S. App.D.C. at 276, 284–287, 443 F.2d at 691, 699–702, the Chief Administrative Officer of the FEA issued a public letter stressing the validity of the agency's interpretation

of the applicable regulations.[90] Also, the agency completed a rulemaking proceeding, after hearing presentations from many refiners, regarding the validity of its interpretation.[91] *Compare, Abbott Laboratories, supra,* 387 U.S. at 151, 87 S.Ct. 1507 (quoting from *United States v. Storer Broadcasting,* 351 U.S., at 198, 76 S.Ct., at 768 " 'The process of rulemaking was complete' ").

The court is not persuaded by the FEA's argument that the plaintiffs present *no* issues which are now fit for judicial review because FEA consideration of the factual questions pertaining to the individual hardship which strict enforcement of the agency's interpretation may visit upon certain firms, and the gross inequity which such strict enforcement may work on some refiners, could moot the necessity for judicial examination of the validity of the agency's interpretations. The factual issues which may establish discretionary relief from the FEA's regulatory interpretation, are analytically unrelated to the purely legal questions triggered by the plaintiffs' challenge to the validity of the interpretation from which some firms may be entitled to individualized relief because of circumstances peculiar to them. For example, in-

---

**89.** On at least nine separate occasions between January 31, 1976 and April 27, 1977, the FEA confidently announced its view of the validity of its interpretation of the regulations governing the time frame January 1, 1975 through January 31, 1976. Such announcements occurred on: (1) February 1, 1976 (*see* this Memorandum of Opinion, *supra,* at p. 336); (2) March 3, 1976 (*see* this Memorandum of Opinion, *supra,* at p. 338); (3) August 3, 1976 (*see* this Memorandum of Opinion, *supra,* at p. 343); (4) September 15, 1976 (*see* text accompanying fn. 44, *supra*); (5) September 23, 1976, Administrator Zarb's letter to Dingell announcing the FEA's position that its interpretation was correct (*see* this Memorandum of Opinion, pp. 345–346, *supra*); (6) October 5, 1976 (*see* text accompanying fn. 50, *supra*); (7) March 28, 1977 (*see* fn. 62, *supra*); (8) April 14, 1977 (*see* this Memorandum of Opinion, p. 353, *supra*) (implicitly, sub silentio, endorses the February, 1976 interpretation by excluding issues relating to its validity from the exception proceedings); (9) April 21, 1977 (*see* this Memorandum of Opinion, p. 356, *supra*).

**90.** *See* this Memorandum of Opinion, pp. 344–346, fn. 48, *supra.*

**91.** On March 3, 1976, a rulemaking proceeding with respect to the regulations governing January 1, 1975 through January 31, 1976 was announced. *See,* text accompanying fn. 35, and p. 340 of this Opinion, *supra.* On March 18, 1976, numerous refiners responded, at a public meeting, to the FEA's March 3, 1976 notice. *See,* fn. 38, *supra,* and accompanying text. On April 6, 1976, the FEA announced that the rulemaking, with respect to the regulations covering the period prior to February 1, 1976, was still open. *See,* p. 341, *supra* of this Memorandum of Opinion. In their exception petitions Shell and Exxon both attempted to argue the issue of the validity of the FEA's interpretation of the applicable regulations, *see,* this Memorandum of Opinion, pp. 348–350, *supra,* and Exxon orally argued that the March 3, 1976 rulemaking was still open as of March 28, 1977. *See,* fn. 62, *supra.* The FEA now adopts the position that this rulemaking proceeding was terminated by the agency's October 5, 1976 announcement in the Federal Register. *See,* fn. 62, *supra,* and this Memorandum of Opinion, *supra,* at p. 354. *Compare* the October 5, 1976 announcement, discussed in this Memorandum of Opinion, *supra,* at p. 346.

quiry into whether strict enforcement of the FEA's current interpretation will place a firm, which relied on agency information during the applicable period, in a *severe cash deficiency* position raises factual questions, the resolution of which is logically unrelated to the resolution of the issues of the finality of the FEA's regulatory interpretation and the legal validity of that interpretation.[92] Therefore the court finds that two issues pled by the plaintiffs in this case are now fit for pre-enforcement, declaratory judgment, judicial review. Those issues are:

(1) Whether the FEA's interpretation of the semantic meaning of the regulations governing refiner passthroughs of increased costs during the period January 1, 1975 through January 31, 1976, is correct.

(2) Assuming *arguendo* that the FEA's current interpretation of the semantic meaning of the applicable regulations is correct, are those regulations inconsistent with the procedural and substantive statutes pursuant to which the regulations were promulgated?[93]

The court further finds that most of the other issues raised by each refiner involve factual considerations which render those issues *unfit* for judicial determination prior to preliminary consideration of those issues by the FEA.[94]

C. THE FEA'S PRESENT INTERPRETATION OF THE INTERPRETATION OF THE INCREASED COST PASSTHROUGH REGULATIONS GOVERNING THE PERIOD JANUARY 1, 1975 THROUGH JANUARY 31, 1976 CAUSES SUFFICIENT HARDSHIP ON THE REFINER PLAINTIFFS IN THIS CASE TO RENDER THAT FEA DECISION NOW RIPE FOR PRE–ENFORCEMENT, DECLARATORY JUDGMENT JUDICIAL REVIEW.

■ In order for a federal agency's final decision on a question of law to be ripe for

**92.** While the availability of administrative discretionary relief does not have a bearing on whether a final agency's decision, pertaining to purely legal issues, is fit for judicial decision, the availability of such relief, may, in some cases, sufficiently ameliorate the harm to the plaintiff, that the issues which are fit for judicial decision, are nevertheless, *not ripe*. *Compare* this Memorandum of Opinion, Part III, C, *infra*. However, this is not such a case.

**93.** Judicial review of these issues now will not disrupt the operations of the FEA, since that agency currently refuses to maintain an administrative forum where the merits of those issues may be raised. *See*, Mr. Goldstein's April 14, 1977 decision in the Exxon exception proceedings, where he holds that the Office of Exceptions and Appeals will not hear argument on the validity of the FEA's interpretation. The second issue denominated in the text, *supra*, includes the validity of the promulgation process under which the applicable regulations were created and whether the applicable regulations, as *interpreted* by the FEA, are consistent with the substantive enabling statutes, in the Economic Stabilization Act, the Emergency Petroleum Allocation Act, the Energy Policy Conservation Act, and the Federal Energy Administration Act.

**94.** Many of the plaintiff refiners seek to litigate questions regarding their personalized good faith reliance on representations by FEA officials, or questions of estoppel of the agency because of its conduct. These allegations require factual determinations and therefore are not ripe for pre-enforcement judicial review. Likewise, allegations that the interpretation and regulations in question are "arbitrary and capricious," or lack a "rational basis," for reasons other than those arising from the two legal issues identified in the text of this Opinion, involve factual inquiries which this court will not attempt to conduct until the FEA has passed on the factual circumstances pertaining to each separate refiner. *See, American Nursing Home Association, supra*, 497 F.2d at 913; *Anderson v. Dunlop*, 485 F.2d 666, 667–668 (Em.App., 1973) (holding that a plaintiff's charge that CLC regulations were irrationally discriminatory asserted factual issues requiring exhaustion of administrative remedies).

The court does not now dismiss the constitutional claims of the plaintiffs. After the court deals with the legal interpretation issues now before it, the court will consider whether the constitutional claims asserted are substantial and whether those issues should be certified to the Temporary Emergency Court of Appeals under 12 U.S.C. § 1904, note § 211(c).

Likewise, the court does not dismiss the "Second Claim" in Texaco's Complaint, Case No. C77–11, dealing with the Freedom of Information Act, 5 U.S.C. § 552. That issue shall remain pending before this court.

pre-enforcement, declaratory judgment, judicial review, the plaintiff must demonstrate that it incurs an identifiable *hardship* which is *directly and immediately* traceable to the bare existence of a fixed agency position on the legal question which is the subject of the plaintiff's complaint.[95] *See, Abbott Laboratories, supra*, 387 U.S. at 149, 153, 87 S.Ct. 1507; *Toilet Goods Association et al. v. Gardner, supra*, 387 U.S. at 162, 87 S.Ct. at 1523 (". . . assess the hardship to the parties if judicial relief is denied at that stage."), 164, 87 S.Ct. 1524, (". . . the test of ripeness . . .. depends . . on the degree and nature of the regulation's present effect on those seeking relief"), 165–167, 87 S.Ct. 1525; *Gardner v. Toilet Goods Association, et al., supra*, 387 U.S. at 171–174, 87 S.Ct. at 1528 (". . . regulations . . . have an immediate and substantial impact upon the respondents."); *National Automatic Laundry, supra*, 143 U.S.App.D.C. at 281–283, 443 F.2d at 696–698 ("*Hardship to Parties of Deferring Court Consideration* ").

■ The FEA's final, legal decision that the increased cost passthrough pricing regulations governing the period January 1, 1975 through January 31, 1976 mandated an all product-cost first rule inflicts serious harm on the plaintiffs in this case by casting doubt upon the propriety of past refiner conduct, on which the refiners must rely in planning the present and future operations of their businesses. The FEA repeatedly, and unequivocally stated its intention to enforce its interpretation of the applicable regulations in all cases where exception relief, limited to the discretionary standard of "serious hardship," or "gross inequity" is not granted. According to the complaints

filed in each case, all nine of the plaintiffs are currently in an irrevocable position of non-compliance with the FEA's interpretation. The FEA estimated that its interpretation would reduce the total amount of allowable non-product costs available for recovery by refiners during the period in issue by approximately $1.3 billion,[96] and this figure excludes the additional increment of allowable cost increases, recoverable under the Reverse Sequential approach, but not recoverable under the proportional approach. The plaintiffs and other members of the industry have a huge potential liability hanging over their heads. The likely magnitude of that liability must have a seriously adverse impact upon the budgeting and planning process of the plaintiff refiners in this case. When individual companies must take into account potential refunds or banking adjustments amounting to many tens of millions of dollars, planning for new investments in production or refining and other major expenditures inevitably suffers.[97]

The harmful effect of the agency's interpretation on the litigants' budgeting and planning functions is a consideration that must be considered by this court, as it was in *Romeo Community Schools v. United States Department of Health, Education, and Welfare*, 438 F.Supp. 1021, 1028 (E.D. Mich., 1977).[98]

Under the FEA's interpretation, those refiners which do not qualify for discretionary exception relief, must adjust their banks in significant amounts. The size of each refiner's bank may affect the legality of prices it has charged in the past, is charging currently, and will charge in the future, for petroleum products subject to

---

**95.** The hardship must be derived solely from the existence of the agency's decision, and it *must also be attributable to unique circumstances* pertaining to the plaintiff, over and above the generalized threat of enforcement inherent in the existence of all clearly announced rules of law. Furthermore, the court determines that the plaintiff has the burden to persuade the court, by a preponderance, that a hardship is incurred.

**96.** *See*, fns. 44–47, *supra*, and accompanying text.

**97.** The FEA states that strict enforcement of its interpretation would result in "massive" refunds to customers, or " 'bank' reductions." *See* this Memorandum of Opinion, p. 342, text, accompanying fn. 43, *supra*, and 41 Fed. Reg. 33282, 33283 (August 9, 1976).

**98.** On the issue of the scope of 20 U.S.C. §§ 1681, *et seq., contrast Romeo, supra* with *Piascik v. Cleveland Museum of Art*, 426 F.Supp. 779, 781, fn. 1 (N.D.Ohio 1976).

price control. Until judicial determination of the validity of the FEA's interpretation, the amount of banked increased costs available for inclusion in prices will remain indeterminate and therefore subject to question. Exxon is particularly in danger of sustaining an adverse impact because it has no exception proceeding currently pending, and the FEA is considering an order which would preclude Exxon from ever obtaining discretionary exception relief.[99]

·In addition, the FEA's interpretation confronts the plaintiff refiners with a serious threat of private enforcement actions under § 210 of the Economic Stabilization Act[100] to recover "overcharges," and limited treble damages, resulting from alleged violations of the regulations in issue. One such private action has already been instituted, *Marine Petroleum Co. v. Champlin Petroleum Co.*[101] Without prompt judicial review of the agency's interpretation, private suits,

**99.** *See,* FEA's telegram to Exxon, dated April 15, 1977, read into the record by Goldstein. Transcript of Conference conducted on April 15, 1977, pp. 6–7, Attachment M, accompanying the FEA's Motion to Dismiss. *See also,* p. 355, *supra* of this Memorandum of Opinion.

**100.** 12 U.S.C. § 1904, note § 210(b) pertinently provides:

"(b) In any action brought under subsection (a) against any person renting property or selling goods or services who is found to have overcharged the plaintiff, the court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:

" '(1) an amount not more than three times the amount of the overcharge upon which the action is based, or

" '(2) not less than $100 or more than $1,000; except that in any case where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge:

*Provided,* That where the overcharge is not willful within the meaning of section 208(a) of this title, no action for an overcharge may be brought by or on behalf of any person unless such person has first presented to the seller or renter a bona fide claim for refund of the overcharge and has not received repayment of such overcharge within ninety days from the date of the presentation of such claim."

An interesting question is whether discretionary exception relief, obtained pursuant to 12 U.S.C. § 1904, note § 207(b), which is predicated on the assumption that the refiner violated the ESA, Pub.L. 92–210, by charging more than was proper under the applicable regulations, bars *both* FEA enforcement actions under 12 U.S.C. § 1904, note § 209, and private civil damage enforcement actions by consumers and purchasers seeking to be made whole, under 12 U.S.C. § 1904, note § 210(a). Exception relief, which is limited to the refiner's serious hardship, or gross inequity to the refiner, implicitly

assumes that the refiner violated *valid* applicable regulations. In contrast, damage relief makes whole the party who was injured by that violation of *valid* price regulations. Conceivably, exception relief might be construed to bar only subsequent FEA enforcement actions against some refiners, who must be assumed to have violated a valid regulation, on the ground that FEA enforcement against that particular violator works a serious hardship, or a gross inequity on the violator. However, that sort of relief has nothing to do with making whole the party who suffered damage from the violation of a *valid* price regulation. Such persons might well be able to continue to rely upon the FEA's interpretation that the refiners violated valid regulations, and seek damage compensation under § 210(a). If such were the case, then exception relief, could not protect the refiner plaintiffs from the serious harm of defending multiple § 210(a) damage suits, even though the exception would protect against FEA enforcement actions under § 209. *Compare,* the role of the CLC, the FEA's predecessor agency, in *Air Products and Chemicals v. United Gas Pipe Line Company,* 503 F.2d 1060, 1062 (Em. App., 1974). *But see* the definition of "overcharge" in 12 U.S.C. § 1904, note § 210(c). *See also,* 41 Fed.Reg. 50856, 50861–50862 (November 18, 1976). In such a situation, the only protection for refiners from the harm of defending multiple suits, would be a prompt judicial determination of the validity of the FEA's interpretation of its regulations. The importance of prompt judicial review blossoms into an urgency when the FEA simultaneously maintains that its regulatory interpretation is correct, but that the applicable regulations were "ambiguous." *Compare,* 41 Fed.Reg. 33282, 33283 (August 9, 1973); 41 Fed.Reg. 43953–43954 (October 5, 1976).

**101.** *See,* Transcript of Conference conducted on April 15, 1977, pp. 16–19, Attachment M, accompanying FEA's Motion to Dismiss, and fn. 60, *supra.* The harm inflicted by the necessity of litigating the same purely legal question, in defense of multiple lawsuits, has been held to be so severe as to constitute "exceptional circumstances" sufficient to overcome the doc-

based solely on the FEA interpretation, may well proliferate before all administrative and judicial review phases of the discretionary exception proceedings are exhausted. Such a threat of multiple private, civil enforcement actions was a vital contributing factor to the court's finding of sufficient hardship to justify pre-enforcement, declaratory judgment, judicial review of a final agency "interpretation" in *National Automatic Laundry, supra,* 143 U.S. App.D.C. at 281–282, 443 F.2d at 696–697.

The administrative discovery prerequisite for participation in the discretionary exception proceedings which, according to the FEA blunt the refiners' hardship claims, tangibly harm the refiners in light of the possibility of multiple, private civil damage and enforcement actions to which the refiners are exposed by the FEA's interpretations. Under the administrative exception scheme, as organized by the FEA, the refiners must allow discovery of their records by the Consumers Union,[102] the publisher of the nationally circulated magazine, *Consumers Reports.*[103]

Thus, under the FEA's view that judicial scrutiny of the agency's interpretation should be postponed until after completion of the exception proceeding, those refiners that wish to challenge the validity of the agency's interpretation are confronted with a dilemma. They may pursue exception proceedings, which offer no opportunity to raise the issue which they deem crucial,[104] and thereby aggravate their exposure to

private civil damage actions by seeking discretionary relief through administrative litigation and discovery with the publisher of a national magazine which is read by those persons who may have potential § 210 claims against the refiners. Alternatively, such firms may await the FEA's enforcement of its interpretation and attempt to make daily business judgments about whether to reject future opportunities or to assume future risks, without knowing the impact of the FEA's interpretation on the firm's capacity to capitalize on such opportunities, or assume such risks.

Moreover, the exception and enforcement proceedings contemplated by the agency, including administrative and judicial appeals, would themselves comprise a timely and costly effort for the refiners. The burden of participation in such proceedings—which would be palpably unnecessary if FEA's current interpretation is invalid—is a significant factor to be considered by the court. *See,* for example, *Gardner v. Toilet Goods Association,* 387 U.S. 167, 173–174, 87 S.Ct. 1526, 1529, 18 L.Ed.2d 704 (1967), where the court stated:

"[I]t is quite clear that if respondents, failing judicial review at this stage, elect to comply with the regulations and await ultimate judicial determination of the validity of them in subsequent litigation, the amount of preliminary paper work, scientific testing, and recordkeeping will be substantial. The District Court found in denying the motion to dismiss: 'I con-

trine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *See, Wooley v. Maynard,* 430 U.S. 705, 710–712, 97 S.Ct. 1428, 1433–1434, 51 L.Ed.2d 752 (1977).

**102.** The FEA announced in its March 23, 1977 *Decision and Order* that:

"To the extent necessary, discovery shall also be permitted with respect to the Conoco, Exxon, and Southland cases. However, any such discovery must be directly relevant to the factual and legal issues which the parties have identified and will be required to be conducted in an expeditious manner."
Consumers Union was a party to each of those three exception actions and was presumably entitled to conduct discovery in those proceedings. *See,* Attachment F, p. 4, accompanying

the FEA's Motion to Dismiss. *See also,* text accompanying fn. 60, *supra.*

**103.** *See,* Consumers Union's Motion for Leave to File a Brief Amicus Curiae, in each of the nine cases, p. 3. The FEA may lack power, because of the First Amendment, to restrict Consumers Union's use of information which it obtains through discovery. *See, Reliance Insurance Company v. Barrons,* 428 F.Supp. 200 (S.D.N.Y., 1977).

**104.** Despite attempts by the refiners to litigate the legal question of the validity of the FEA's interpretation of the applicable regulations, the FEA refuses to permit that issue to be raised in the exception actions. *See,* fn. 62, *supra,* and Attachment L, pp. 7–8, accompanying the FEA's Motion to Dismiss.

clude that in a substantial and practical business sense plaintiffs are threatened with irreparable injury by the obviously intended consequences of the challenged regulations, and that to resort to later piecemeal resolution of the controversy in the context of individual enforcement proceedings would be costly and inefficient, not only for the plaintiffs but as well for the public as represented by defendants.' 235 F.Supp. 648, 651."

This court finds that the above quotation applies, with full force, to this case.

Less tangible than the immediate economic burden with which the plaintiffs are threatened, but a matter of real importance nonetheless, is the continuing damage to which the plaintiffs' reputations must necessarily be subject as long as adjudication of the validity of the purported regulations is deferred. The FEA has told the public, and the Congress, that the plaintiffs acted illegally. The only way those charges can be refuted is through judicial review. The plaintiffs are members of an industry which is highly regulated and closely scrutinized by the public, and can be damaged severely by the adverse publicity generated by the FEA's assertion that the petroleum industry "overcharged" the American public 1.3 billion dollars during a thirteen month period. Such damage to the image of the industry may well not disappear merely because some refiners receive total or partial exceptions from the FEA's interpretation or because the interpretation is invalidated (if it should be) by a federal court at some speculative date in the future.[105] *See, Abbott Laboratories, supra,* 387 U.S. at 153, 87 S.Ct. 1507; *Gardner v. Toilet Goods Association, supra,* 387 U.S. at 172, 87 S.Ct. at 1529 ("The price of non-compliance is not limited to these formal penalties. Respondents note the importance of public good will in their industry, and not without reasons fear the disastrous impact of an an-

nouncement that their cosmetics have been seized as 'adulterated' "); *Romeo Community Schools v. United States Department of Health, Education, and Welfare,* 438 F.Supp. 1021, 1028 (E.D.Mich., 1971) ("Plaintiff also contends that defendant's steps toward regulatory enforcement have undermined public confidence in plaintiff, and this may well be so").

The FEA nevertheless argues that in order to establish "hardship" sufficient to obtain pre-enforcement, declaratory judgment, judicial review of the FEA's interpretation, the plaintiffs must show that they are put on the "horns of a dilemma," to either: (1) incur the costs of prospective compliance with an administrative interpretation which the refiners believe to be invalid; or (2) refuse to prospectively conform to that interpretation and assert their claim of the invalidity of the agency's interpretation as a defense in future FEA enforcement actions. *See, Abbott Laboratories, supra,* 387 U.S. at 152, 87 S.Ct. 1507; *Gardner v. Toilet Goods, supra,* 387 U.S. at 171–172, 87 S.Ct. 1526. Obviously, the refiner plaintiffs in this case cannot demonstrate such a "horns of a dilemma" species of hardship because the challenged interpretation applies only to a fixed time frame in the past.

However, the *Abbott Laboratories* doctrine is not limited to such a narrow category of hardship. For example, the Temporary Emergency Court of Appeals in *Atlantic Richfield, supra,* 556 F.2d, at 552–553, applied *Abbott Laboratories* to permit pre-enforcement declaratory judgment, judicial review of an FEA interpretation when the only hardship to the plaintiff was the possibility that the FEA interpretation might have an administrative and judicial collateral estoppel or *res judicata* effect with respect to business arrangements which Atlantic Richfield entered with persons other than those who sought the FEA interpreta-

---

**105.** Administrator Zarb's expression of concern regarding "Recent press reports" to Congressman Dingell, graphically illustrates the sensitivity of the issues involved in the case to publicity. *See also,* Senate Bills 1445, 1448, introduced in the United States Senate on May 3, 1977, and May 4, 1977, respectively, which would institute radical changes in the current relationship between the Federal Government, and the privately owned and operated petroleum industry.

tion. *See, Atlantic Richfield, supra,* 556 F.2d at 549–553.[106] *See also, Romeo Community Schools, supra,* 438 F.Supp. at 1028 ("Thus, while the regulations here in question do not carry the kind of automatic civil and criminal penalties involved in *Abbott Laboratories,* their impact upon plaintiff has nevertheless been made direct, immediate and adverse by defendant's pre-enforcement conduct.")

The court concludes that the refiner plaintiffs in this case demonstrated that they suffer from a direct and immediate hardship traceable to the FEA's final decision on the purely legal question of the validity of the agency's interpretation of the petroleum price regulations governing the period January 1, 1975 through January 31, 1976. The identifiable hardship consists of: (1) the impact of the FEA's interpretation on the firm's daily budgeting and planning functions; (2) the exposure to multiple treble damage, private, civil enforcement court litigation under § 210 which the FEA's interpretation inflicts on the plaintiffs; (3) the burdensome expense and discovery strategy dilemma which the exception proceedings entail; (4) the damage to the refiners', and the industry's, public reputation and good will stemming solely from the FEA's public announcement of its interpretation and the 1.3 billion dollar overcharge conclusion derived from that interpretation.[107]

---

**106.** The FEA relies on the recent decision of *Diversified Chemicals and Propellants Company v. Federal Energy Administration, et al.,* 423 F.Supp. 859, 862–64 (N.D.Ill., 1977) for the conclusion that a firm which is subjected to a final FEA interpretation on a question of law does not suffer sufficient harm to justify pre-enforcement declaratory judgment, judicial review under the *Abbott Laboratories* ripeness doctrine. However, that opinion failed to consider the collateral estoppel or *res judicata* effect that might attach to FEA interpretations. Yet, such a possible effect was the basis of the Temporary Emergency Court of Appeals decision five days *after* the issuance of the *Diversified Chemicals* opinion, that an FEA interpretation was ripe for pre-enforcement, declaratory judgment, judicial review, in *Atlantic Richfield v. FEA,* 556 F.2d 542, 549–553 (Em.App., 1977). The court concludes that *Diversified Chemicals*

## IV.

## CONCLUSIONS

The court concludes that: (1) Congress did not express an intention to preclude pre-enforcement, declaratory judgment review of the validity of the FEA interpretation involved in this case; (2) the validity of the challenged FEA interpretation both semantically (*i. e.,* examining the meaning of the regulations) and in terms of its procedural and substantive statutory authorization, are purely legal questions on which the FEA has expressed a final position; (3) the plaintiffs suffer serious harm from that interpretation. The court therefore holds that the two issues of the semantic validity of the FEA's interpretation and the issue of the statutory authorization for the promulgation of that regulation and its interpretation are now ripe for pre-enforcement judicial review.[108] The court likewise dismisses, as not ripe for review, the other, factually based, claims of each plaintiff.[109]

■ Having determined the ripeness of the claims raised by the refiners, the court holds that the doctrine of exhaustion of administrative remedies should not be applied to the ripe issues, because the underlying policy concerns of the exhaustion doctrine are similar to those supporting the ripeness doctrine. *See, National Automatic Laundry, supra,* 143 U.S.App.D.C. at 285, 443 F.2d at 700 ("The need for further

---

cannot control this case, in light of the subsequent decision in *Atlantic Richfield.*

**107.** The court views the cumulative effect of all four categories of burdens, taken conjunctively, as establishing, by a preponderance, that the refiners are placed under a sufficient hardship to render the final, legal issues presented by this case ripe for judicial review under *Abbott Laboratories.* The court issues no comment on whether sufficient hardship would exist if any combination of three or less of the burdens identified in this Opinion were all that was established by a plaintiff seeking pre-enforcement judicial review of an agency decision.

**108.** *See,* fn. 93, *supra.*

**109.** *See* the limitations on the court's dismissal decision stated in fn. 94, *supra.*

agency consideration precludes finality on grounds not unrelated to the doctrine requiring exhaustion of administrative remedies . . . ."). For the same reason, the court applies the exhaustion doctrine to those issues which it holds not currently ripe for judicial review.

▇ With respect to the FEA's assertion that the doctrine of Primary Jurisdiction compels this court to defer to the FEA's exception proceedings, the court notes that the policy concerns underlying that doctrine are similar to those relating to administrative ripeness, and administrative exhaustion. *See generally*, the discussion of Primary Jurisdiction in *Mississippi Power and Light Company v. United Gas Pipe Line Company, et al.*, 532 F.2d 412, 417–422 (5th Cir., 1976). The court declines the FEA's invitation to refer back to the agency the two issues which are now ripe for judicial review. The court so rules because the FEA has already had ample opportunity to consider those issues and has reached a fixed position on them. Likewise, the issues which are not ripe for review, should be referred to the agency under the Primary Jurisdiction theory, because they involve factual questions to which the application of FEA expertise will no doubt be helpful.

The court consolidates all nine cases for purposes of considering the merits of the two legal issues over which the court retains jurisdiction.

110. The court notes that the best policy might be for the FEA to withhold resumption of administrative actions dealing with exceptions or enforcement of the January 1, 1975 through January 31, 1976 regulations, pending this court's decision on the controlling legal issues. However, the court believes that the agency should be permitted to choose the course which it finds most consistent with its efficient operation.

111. In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 155–156, 87 S.Ct. 1507, 1519, 18 L.Ed.2d 681 (1967) Justice Harlan expressly qualified the administrative ripeness doctrine with the statement:

". . . it is important to note that the institution of this type of action does not, by itself stay the effectiveness of the challenged regulation.

The court dissolves its April 27, 1977 stay of the FEA's administrative exception proceedings, recognizing that the exception proceedings which the FEA contemplates focus on factual matters pertaining to severe hardship or gross inequity, which are logically unrelated to the resolution of the two purely legal issues pending now in this court. Thus while this case is pending on the issues over which the court today assumes jurisdiction, the FEA, if it so desires,[110] is free to conduct administrative proceedings involving the parties to this action, and all other regulated refiners, relating to discretionary relief from the FEA's current interpretation of the applicable regulations, or administrative enforcement of those regulations. The court so rules, in order to minimize the potential friction between the pendency of the litigation in this Ohio Federal District Court and the FEA's legitimate interest in efficient regulation of the petroleum industry pursuant to the applicable Congressional enactments.[111]

IT IS SO ORDERED.

## NON–FINAL ORDER

Based on the Memorandum of Opinion filed today in these cases, which Memorandum is fully incorporated into this non-final order, the court rules:

". . . If the agency believes that a suit of this type will significantly impede enforcement or will harm the public interest, it need not postpone enforcement of the regulation and may oppose any motion for a judicial stay on the part of those challenging the regulation. Ibid. It is scarcely to be doubted that a court would refuse to postpone the effective date of an agency action if the Government could show . . . that delay would be detrimental to the public health or safety."

The court does not believe that the plaintiffs will be materially damaged if it permits the FEA to decide whether to consider questions of administrative discretion during the pendency of the litigation on the legal issues over which the court assumes jurisdiction. A prompt ruling by this court on those legal issues sufficiently protects the plaintiff's legitimate interests.

(1) The Defendants' Motion to Dismiss the Plaintiffs' Complaints is denied as to the two legal issues delineated on page 365 of the Memorandum of Opinion. *See also*, fn. 93.

(2) The Defendants' Motion to Dismiss the Plaintiffs' Complaints is granted as to those allegations in each of the respective Plaintiffs' Complaints, which raise factual questions relating to their own, individualized good faith reliance on representations by FEA officials, equitable estoppel of the agency, the lack of a "rational basis" for the FEA's applicable rules, etc. *See*, the Memorandum of Opinion, p. 365, fn. 94.

(3) That the court will retain jurisdiction over the Plaintiffs' allegations of Constitutional violations, in order to determine, after it rules on the merits of the issues delineated in ¶ 1, *supra*, whether such allegations of Constitutional violation, should be certified to the Temporary Emergency Court of Appeals. *See*, the Memorandum of Opinion, p. 365, fn. 94.

(4) That the court will retain jurisdiction over the "Second Claim" in Texaco's Complaint, Case No. 77–11, dealing with the Freedom of Information Act. 5 U.S.C. § 552. *See*, the Memorandum of Opinion, p. 365, fn. 94.

(5) The court consolidates all nine of these cases for consideration of the legal issues delineated in ¶ 1, *supra*. *See*, the Memorandum of Opinion, p. 371.

(6) The court dissolves in total the stay of administrative proceedings issued in these cases on April 27, 1977. *See*, the Memorandum of Opinion, p. 371.

IT IS SO ORDERED.